JOINER, Judge.
Clayton Antwain Shanklin was convicted of one count of capital murder for killing Michael Crumpton (“Michael”) during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala.Code 1975; a second count of capital murder for killing Michael during the course of a first-degree burglary, see § 13A-5-40(a)(4), Ala.Code 1975, and one count of attempted murder for attempting to cause the death of Ashley Crumpton (“Ashley”), Michael’s wife, see §§ 13A-4-2 and 13A-6-2, Ala.Code 1975. During the penalty phase - of Shanklin’s trial, the jury, by a vote of 12 to 0, recommended that Shanklin be sentenced to life imprisonment without the possibility of parole. After receiving a presentence-inves-tigation report and conducting a sentencing hearing, the circuit court overrode the jury’s recommendation, finding that the aggravating circumstances “vastly out-weighted]” the mitigating circumstances, and sentenced Shanklin to death. Shank-lin filed a motion for a new trial, which the circuit court denied. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-53, Ala. Code 1975. We affirm.

Facts and Procedural History

The evidence introduced at trial established the following: On October 11, 2009, Shanklin sent Tracy Ward, his girlfriend, a text message telling her that he wanted to “meet up” and smoke marijuana. Ward then drove to Parrish, to pick up Shanklin at his grandmother’s house; she arrived at approximately 9:00 p.m. Ward and Shank-lin then drove to Shanklin’s mother’s house and, thereafter, drove to the Warrior River Apartments in Cordova, because Ward was going to purchase marijuana from her long-time friend, Michael. Ward telephoned Michael and told him that she would be coming by his apartment to purchase marijuana. According to Ward, Shanklin had never been to Michael’s apartment and he stayed in the vehicle when she went into Michael’s apartment to purchase the marijuana.
When Ward entered Michael’s apartment, she saw,Michael, Ashley, Michael’s mother, Lori Crumpton, and Michael’s un- *746 ele, Lonnie Beard. Ward and Michael went into the master bedroom where Ward paid Michael $25 for one gram of marijuana. According to Ward, when Michael gave her the marijuana she observed more marijuana “in individual sacks” and also observed “a stack of cash.” According to Ashley, when Ward and Michael returned from' the master bedroom, Ward said, “Wall have, a-lot of money.’” (R. 590.) Ward then left Michael’s apartment and returned to her vehicle.-
Ward and Shanklin left the apartment complex and, according to Ward, Shanklin asked her whom she had seen in the apartment, how much marijuana she had seen in the apartment, and what kind of marijuana she had seen in the apartment. Ward told Shanklin that she had seen “only a few sacks” of marijuana but that it was “hydro,” which, she said, means “a very high grade of marijuana.” Ward told Shanklin that she had seen “a stack of money in there also.” Ward and Shanklin returned to .Parrish, where they went to an abandoned house and smoked the marijuana. Thereafter, Ward told Shanklin that she was going to go home; Shanklin, however, told Ward that he wanted to go to Jasper to pick up his cousin Kevin Shanklin (“Kevin”), Ward stated that she suspected that Shanklin and Kevin were going to rob Michael because Shanklin had mentioned “earlier that he wanted to go in there,” presumably talking about Michael’s apartment.
Ward then drove Shanklin to Kevin’s house. Shanklin went inside ' Kevin’s house where he remained for approximately 20 minutes; thereafter, both Shanklin and Kevin carné out of Kevin’s house and got into Ward’s vehicle. Shanklin then told Ward that they wanted to go to “Jeremiah’s” apartment — Jeremiah, like Michael, lived at the Warrior River Apartments. Ward then drove Shanklin and Kevin to the Warrior River Apartments and let them out in front of Jeremiah’s apartment sometime “before midnight.” According to Ward, Shanklin sent her approximately 100 text messages between 11:49 p.m. and 2:40 a.m. Although Ward stated that she knew what was going to happen, she did nothing to stop it.[1]
According to Ashley, after Ward left the apartment, the family continued to watch television. Around midnight Ashley decided to go to sleep in the master bedroom; Michael and Lonnie, however, stayed awake. At that time, Michael and Ashley’s two-year-old and eight-month-old children were asleep in the bedroom they shared, which was adjacent, to the master bedroom. Around 1:30 a.m., Ashley awoke and went outside to smoke a cigarette, and Michael joined her^-Lonnie had already left the apartment. Michael and Ashley then went back inside the apartment, checked to make sure the doors were secured, and went to sleep in the master bedroom.
Thereafter, Ashley was awakened by voices, and she attempted to wake Michael but she noticed someone in the room. Ashley then lay back down because, she said, she “was going for [her] gun,” which was normally kept under her pillow; her gun, however, was not there. Ashley then sat up in the bed, and the individual next to the bed pulled out a gun, which she described as a silver, revolver-type gun, and said, ■“ ‘Bitch, don’t move.’ ” Ashley *747 also saw a second, individual at the foot of the bed. According to Ashley, the individual with the gun was wearing a ski mask and the individual at the foot of the bed was wearing a bandana, which, she said, covered only the bridge of his nose and his mouth. Ashley screamed at them to get out of the apartment.
At that time, the individual wearing the ski mask fired the gun, hitting her in the upper thigh. The individual wearing the ski mask then gave the gun to the individual wearing the bandana, who then “put[ ] the gun in [her] face and pullfed] the trigger three times”; the gun, however, mis-feed, and he passed the gun back to the individual wearing the ski mask.. While the gun was in her face, Ashley noticed that the individual wearing the bandana had “[l]ight skin ... [and] a scar on the right side of his face,” (R. 609.) After the individual wearing the bandana handed the gun back to the individual wearing the ski mask, Ashley began fighting the individual wearing the bandana, and Michael awoke and began yelling at the two individuals.
According to Ashley, the two individuals also had in their possession “big and bulky looking” rocks, which, she said, appeared to be from the nearby railroad tracks. As Ashley was fighting the individual wearing the bandana, he struck her twice in the chest with the rock. Ashley, however, was able to “get the rock from his hand and start striking him with it.” (R.' 611.) Then the individual wearing the ski mask struck Michael on the head with a rock and the individual wearing the bandana escaped from Ashley and ran “back down the hallway.” (R. 611.) Ashley then turned to help Michael fight the individual wearing the ski mask. According to Ashley, while Michael was facing the wall, the individual wearing the ski mask “had the gun pointed at Michael’s back.... [and] [h]e pull[ed] the trigger and sho[t] him four times in the back.” (R. 612.) Michael grabbed his back in pain, and the individual wearing the ski mask attempted to run out of the master bedroom. Ashley, however, grabbed him, trapped his head in the bedroom door, and “was hitting him with.the door and his head against the wall.” (R. 613.) Ashley then turned on the bedroom lights and, because the ski mask had come off during the struggle, Ashley saw the side of his face. While Ashley had the individual with the ski mask pinned in the doorway, Michael got up from the bedroom floor with a gun in his hand and told Ashley “to get out.” At that point Ashley let go of the individual with the ski'mask. According to Ashley, the individual with the ski mask ran down the hallway into the living room where the individual with the bandana was waiting, and the two left the apartment.
Ashley then went to Michael and they both walked down the hallway. Ashley then looked into her children’s room and noticed that her children were both awake and in the eight-month-old’s crib; Ashley explained that she did not know how the two-year-old ended up in the crib. Then, according to Ashley, the following occurred:
“[W]e both walked to the sofa, the loveseat, and he has his gun in his hand and I asked him just to'put it down and he drops the gun on the couch. And I asked him if he was okay, and he looked at me and asked me if I were okay and he said no. And I told him I was fine, I had just been shot in the leg. I went to try to open the front door and my hands were shaking so bad I couldn’t open it so he opened it for me. And I told him I was going to call an ambulance so I ran back down the hallway to get our phone that usually sits on the computer stand.
[[Image here]]
*748 “[Michael] looked pale. He couldn’t breathe and he was just hurting.”
(R. 617-18.) Ashley could not find her telephone and told Michael that she was going to Karen Nicholson’s apartment to telephone an ambulance. On the way to Nicholson’s apartment, Ashley saw her upstairs neighbor, Steven Madison, and told him what had happened to Michael. Madison went to Michael’s apartment to tend to Michael, and Ashley went to Nicholson’s apartment to telephone an ambulance. When Ashley arrived at Nicholson’s apartment, which, Nicholson stated, was around 3:00 a.m., Nicholson would not let Ashley leave because Nicholson “was afraid that [the intruders] were still on the grounds.” Nicholson then telephoned 911.[2]
According to Madison, when he entered Michael’s apartment he saw Michael “slumped over the arm of the couch and [he saw Michael’s] oldest daughter standing in the hallway.” (R. 1393.) Madison moved Michael from the couch to the floor in front of the apartment door. Madison stated that Michael looked like “he was trying to hang on.” (R. 1395.) Madison told Michael “to try to hang on and somebody was going to call 911.” (R. 1396.) While Madison was tending to Michael, Madison’s wife came downstairs and took Michael’s children from the apartment. Shortly thereafter, Michael died, which Madison described as “[j]ust a gasp, you know, it was his last breath leaving.” (R. 1399.) Madison then attempted to perform C.P.R, on Michael, but was unsuccessful. According to Madison, Michael appeared to be focused.and maintained eye contact with Madison until he died.
According to Ashley,
“[a]s [she] was sitting there on the couch, [she] could hear [Madison] talking to Michael and said, ‘Come on, man. I’ll take you over there.’ And they were trying ... to get out of the apartment. And they never made it out of the apartment.”
(R. 621.) Shortly after 3:00 a.m., paramedics and law enforcement arrived at the apartment.
Josh Bankston, a paramedic with Regional Paramedic Services in Jasper, responded to the 911 call. Bankston assessed Michael and determined that Michael showed no signs of life. Bank-ston stated that Michael was “apneic and pulseless,” and Michael was declared dead on the scene. After the paramedics treated Ashley, she was taken by way of ambulance to the hospital. Keith Concord, the head investigator for the Cordova Police Department, went with Ashley to the hospital. Ashley was treated and released from the hospital the same day. When she was released from the hospital, Ashley went directly to the courthouse to speak with Investigator John Softley and Investigator Frank Cole. Ashley described to Investigator Cole and Investigator Softley the two men who had shot her and Michael. Specifically, Ashley told them:
“[T]hey were two black males, both wearing masks, dark clothing, anywhere from 5'11" to maybe 6 feet tall.
[[Image here]]
“I told them-they were small in size.
[[Image here]]
“... I told them that the guy at the foot of the bed had a scar on the right *749 side of his face, kind of, I told them they both kind of had big ears.”
(R. 625.)
Shortly after 3:00 a.m., Shanklin sent Ward a text message asking her to come pick him up. Although Ward initially declined to do so, she eventually agreed. Ward stated that Shanklin told her to pick him up on River Road, which, she said, was “[b]y the asphalt plant by the railroad tracks.” (R. 721.) According to Ward, when she arrived, at River Road, it was raining and Shanklin-and Kevin appeared to be “[s]cared, terrified, [and] nervous” (R. 722), and Shanklin was not wearing shoes.
When Shanklin got into Ward’s car, Ward asked him what was wrong and Shanklin told her, “[w]e shot him.” (R. 725.) Shanklin told Ward to drive to Kevin’s house. When they arrived at Kevin’s hou.se, Kevin got out of the car and then Shanklin and Ward drove to Shanklin’s grandmother’s house in Parrish. According to Ward,. Shanklin told her that, if anyone asked, she was to tell them that she had not seen him.
After being droppéd off at his Grandmother’s house, Shanklin spoke with hi's cousin, Isaiah Howze, and told him that “he messed up and killed someone” in an apartment.[3] At some point, Shanklin also had a conversation with another cousin, Tyrone Dickerson, and, according to Dickerson, Shanklin told him that “some shit went wrong” and that “it was a scuffle and she wasn’t backing down. He wasn’t backing down.”[4] (R. 839, 841.)
Later that morning Ward received a “MySpace instant messag[e]”[5] from Shanklin. According to Ward, Shanklin asked her if she had “talked to any police.” (R. 729.) By the time Ward had received the instant message from Shanklin, she had learned that Michael had died, and she asked Shanklin if they had killed him. According to Ward, Shanklin did not respond.
Around 5:30 a.m., Shanklin sent Amber Piper, another girlfriend, text- messages asking her to come pick him up, arid Piper did so. According to Piper, Shanklin left his grandrnother’s house “with a garbage bag of clothes, threw them in the back of the truck,” and they left. Piper stated that Shanklin appeared to be nervous and that she “knew something was wrong.” Piper asked Shanklin what was wrong, and Shanklin tpld her that he had shot somebody. When Piper asked if he had actually shot somebody, Shanklin told her “he was just playing,” (R. 764.) Piper stated, however, that she knew something was wrong. Piper and Shanklin then drove to Piper’s grandfather’s house in Gadsden. While at her grandfather’s house, Piper continued to ask Shanklin what was wrong, and, according to Piper, Shanklin told her that he had killed somebody, explaining:
“He said that earlier that day, the day that the shooting actually, happened, the girl Tracy went into the house, unlocked the back door, that she went there to buy weed because the guy that got shot, I guess, sold weed to her. And she went in there and hung out for a little while and unlocked the back door, and later on that night him, [Shanklin], another guy and Tracy went in the house *750 through the back door and proceeded to look around for the drugs and the money. And [Shanklin] walked up to the guy while he was asleep in the bed and put a gun to his back and said, ‘MF’er, are you ready to die.’ And the guy jumped up and started fighting for his money. [Shanklin] shot him, and [Shanklin] and all of them ran out of the house and jumped in Tracy’s parents’ car and left. And when they left [Shanklin] threw out the clothes and the ■ gun out the window, and I assume that Tracy went home after she took them home.”
(R. 769-70.) Piper stated that, after Shanklin told her that he had shot’someone, she was scared, and Shanklin told her that he would kill her and her child if she told anyone. According to Piper, Shanklin then took her cellular telephone because he did not want her to telephone anyone. Piper and Shanklin then went to Piper’s mother’s house in Albertville.
On October 14, Ashley met with Investigator Softley, Investigator Cole, and Cor-dova Police Department Chief of Police Kenneth Bobo at the Cordova Police Station. At that time, Ashley was given 29 photographs to look through to see if she could identify the individuals that had been in- her apartment. According to Chief Bobo, Ashley
“was flipping through the stack of photographs and she immediately recognized one photograph and said, ‘Oh my God, this is one of them,’ and become very hysterical, excited. She kept on flipping through the photographs, flipped through maybe five or ten more, found, another picture and said, ‘This is the other one, this is the other one,’ and she started crying. You know, we had to give her-a few moments to recoup herself.”
(R. 1165-66.) Ashley identified Shanklin and Kevin. Thereafter, Investigator Cole, Investigator Softley, and Chief Bobo picked up Ward to question her and also arrested Kevin. Around 7:00 p.m., Investigator Cole and Investigator Softley were interviewing a witness, and Investigator Softley received a telephone call from Shanklin. According to Investigator Soft-ley, he
' “stepped outside of the office in another room and I answered the phone and the caller identified himself as Twain And he asked me, he said, ‘John, I heard /all had been looking for me.’ I said, Yeah, Antwain,’ I said, “We have.’ I said, ‘We have a witness up here that we’ve been talking to them and we need to talk to you and where are you located.’ He said, ‘I’m in Parrish.’ He said, ‘Let me talk to Frank.’ ”
(R. 1510.) Thereafter, Investigator Soft-ley returned to the interview room and told Investigator Cole that Shanklin was on the telephone and wanted to speak with him. According to Investigator Cole, the following conversation occurred:
“I said, ‘Hello.’ He said, ‘Hey, this is Antwain.’ I said, ‘What’s up man?’ Antwain said, ‘Man, this shit bad ain’t it?’ I said, ‘Sure is.’ I said, You need to come up here.’ He then stated, ‘Man, shit just went crazy.’ He said, ‘Is there anything you can do for me?’ I said, ‘Not one thing in the world, Antwain.’ I said, You need to come on in here.’ And Antwain said, ‘How bad is it?’ And I said it was real bad. ,1 then asked him if he was going to come in and when. He said, ‘I’ll be there in about two hours,’ and that he would call [Investigator Softley] when he got close to Jasper.”
(R. 1498-99.) Shanklin, however, did not turn himself in.
*751 Gary Stanfield, the chief investigator at the Boaz Police Department, was contacted by law-enforcement officers from Walker County and was told that Shanklin might be in his area. Investigator Stan-field was provided with a description of Shanklin and information that he might be with a girl from that area and that the girl had family in that area.'
On October 15, 2009, Investigator Stan-field visited Piper’s family but was informed that, although Shanklin and Piper had been at the house earlier, they had 'left. Thereafter, Investigator Stanfield stated that he “had gotten with [the] Al-bertville Police Department” and had begun searching for Shanklin at “some of the lower end motel areas.” (R. 1228.) According to Investigator Stanfield, when he pulled into the parking lot of the Royal Inn Motel, he saw Piper getting something out of a vehicle that matched the description and license-plate number provided to him by Walker County law-enforcement officers. Investigator Stanfield then approached Piper and asked her if Shanklin was in the room. Piper told Investigator Stanfield that Shanklin was in the motel room and gave Investigator Stanfield a key to the room. Thereafter, Investigator Stanfield entered the motel room and took Shanklin into custody.
On October 16, 2009, Investigator Cole and Investigator Softley spoke with Jerrell Thomas. Thomas stated that before October 12, 2009, Shanklin had asked Thomas if Thomas had a handgun and asked if he could use it. Thomas testified that he “told him [he would] see if [he] [could] get it to him” but claimed that he never gave Shanklin the handgun. Thomas, instead, explained that he “gave it to someone,” but could not remember whom he had given it to. Thomas explained, however, that the person he gave it to knew Shanklin. Thomas stated that the gun was a silver .32-caliber revolver.
On October 17, 2009, Chief Bobo drove to the Albertville Police Department to pick up Shanklin. According to Chiéf Bobo, Shanklin, without being questioned, stated that “the girl didn’t have nothing to do with this” and that he “just wanted to tell his side of' the story.” (R. 1143.) Shanklin also asked Chief Bobo how they were able to find him and “said that he bet it was the cell phone.” (R. 1143.) Shank-lin explained to Chief Bobo that he knew Investigator Softley and that Shanklin “actually called [Softley] on his cell phone.” (R. 1143.) Shanklin was then transported to the Walker County jail.
■ While in the Walker County jail, Shank-lin spoke with Joshua Moreland, a' trustee. According to Moreland, Shanklin told him what had happened on October 12, 2009, and Shanklin explained that “they” went to Cordova “to rob them. He supposedly had some high grade weed and some cash and he was trying to come up and they were going to make a hit.” (R. 849.) Moreland stated that Shanklin then explained:
“He said that they had went in to rob them and caught them off guard, and the lady, I guess the guy’s spouse, attacked the other one, Kevin, attacked him. During the time while she was attacking him, she was shot in the leg. And he said he shot her in the leg. She fell down, and I want to say that he said that the guy was trying to pick up a brick to hit him with it. And then he said he unloaded on him, fired at him, and I believe he said he hit him'in the chest several times.”
(R. 851.) Moreland also stated that Shanklin told him that he had “wished he would have killed Kevin” because “it would have been a witness gone.” (R. 851, 852.)
While in the Walker County jail, Shank-lin also spoke with Kenneth Traywick, an *752 other inmate. According' to Traywick, Shanklin said that he and Kevin went to Cordova “to rob somebody for some marijuana and .some money.” . (R. 873.) Shanklin told Traywick that he was armed with a handgun and that they shot “a white guy in an apartment complex in Cordova” and “a female, his wife, girlfriend, I don’t know, shot her in the leg.” (R. 874.) According to Traywick, Shanklin stated that “once, they started shooting they kind of .got scared and ran.” (R. 874.)
Dr. Emily Ward, a medical examiner for the Alabama Department of Forensic Sciences, conducted an autopsy on Michael. According to Dr. Ward, Michael was shot four times in the back. Dr. Ward stated that Michael had “about a liter of blood in the right side of his chest. And there was also blood inside the sac around the heart,” which, she said, would indicate that Michael lived for “several minutes” after he was shot. (R. 1453.) Dr. Ward stated that two of the bullets entered Michael’s back and that “[b]oth of those wounds ,.. just ripped through the muscles of his back and ended up lodged ... behind his fifth rib and the other one behind his eleventh rib.” (R. 1454.) Dr. Ward stated that both of those wounds would cause “severe pain.” (R. 1455.) Dr. Ward testified that a third bullet wound entered Michael’s “right flank” and “ended up on the left side of the pelvis.” Dr. Ward testified that the fourth bullet
“went through the right side of his back and it went into the mid part of his chest area called the mediastinum. It went through the vena cava which is a vein that returns blood to the heart, and then it went into the heart itself. It went through the right ventricle of the heart and the septum in the middle of the heart. It continued through the heart and it impacted the inside of the breastbone where we could see a little bit of blood on the inside of the breastbone and then it kind of ricocheted backward into his diaphragm.”
(R. 1457-58.) Dr. Ward stated that the fourth bullet caused Michael’s death. Dr. Ward agreed that Michael’s death would be “a slow, relatively agonizing death” explaining:
“Once the bullet went through the heart and the vena cava, those areas started to bleed. Because the bullet is coming from the back of the heart to the front, the blood left the sac of the heart first of all and went into the right side of his chest. So, we found about a liter of blood in the right side of his chest and the chest wall is fixed relatively. So if ■ you put a liter of blood, and you can just visualize a two liter bottle of soda and half of that amount of volume is in the right side of his chest so his lung is not going to be able to expand well because the blood is going to keep it from expanding. And that means he can’t take a deep breath of air and he is going to get the sensation of smothering or of not being able to breathe. In addition to that, the blood does collect eventually inside that sac around the heart and that is going to mean that his heart can’t . expand and contract when it beats, so he is going to have a sensation that he is not getting enough blood to his brain and to the rest of his body and at the same time he is suffering from not being able to get a good breath of air, so it would be the equivalent of smothering.”
(R. 1461-62.) During the autopsy Dr. Ward recovered four bullets from Michael’s body.
Dancy Sullivan, a firearms and tool-marks analyst at the Alabama Department of Forensic Sciences, testified that she received and examined four bullets from Dr. Wai-d and a fifth bullet that had been recovered from Michael’s apartment. Sul *753 livan concluded that they were '.32-caliber bullets.
At the close of the evidence, both the State and Shanklin presented closing arguments and the circuit court charged the jury.[6] The jury returned verdicts of guilty as charged in the indictments.

Standard of Review

On appeal from his conviction and sentence, Shanklin raises numerous issues, including some that were not raised in the circuit court. Because Shanklin has been sentenced to death, however, this Court must review the trial court proceedings under the plain-error doctrine, see Rule 45A, Ala. R.App, P.
“ ‘Plain error is defined as error that has “adversely affected the substantial right of the appellant.” The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is “particularly egregious” and if it “seriously af-feet[s] the fairness, integrity or public reputation of judicial proceedings.” See Ex parte Price, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999).’”
Ex parte Brown, 11 So.3d 933, 935-36 (Ala.2008) (quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999)). See Ex parte Walker, 972 So.2d 737, 742 (Ala. 2007); Ex parte Trawick, 698 So.2d 162, 167 (Ala.1997); Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998) (“To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s ‘substantial rights,’ but it must also have an unfair prejudicial impact on the jury’s deliberations.”). See also Harris v. State, 2 So.3d 880, 896 (Ala.Crim.App.2007) (quoting Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999)). Although Shank-lin’s failure to object at trial will not preclude this Court from reviewing an issue, it will weigh against any claim of prejudice he now. makes on appeal. See Dotch v. State, 67 So.3d 936, 965 (Ala.Crim.App. 2010) (citing Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991)). Further,
“‘“the plain[-]error exception to the contemporaneous objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.”” Whitehead v. State, [777 So.2d 781], at 794, [ (Ala.Crim.App.1999) ], quoting Burton v. State, 651 So.2d 641, 645 (Ala.Crim. App.1993), aff'd, 651 So.2d 659 (Ala. 1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).”
Centobie v. State, 861 So.2d 1111, 1118 (Ala.Crim.App.2001). With these principles in mind, we address Shanklin’s claims on appeal.

Discussion

Guilt-Phase Issues

I.
Shanklin contends that reversal of his conviction is required in this case because, he says, “the appellate record is deficient and does not permit full appellate review.” [7]' (Shanklin’s brief, p. 46.) Specifi *754 cally, Shanklin notes that “[t]here are over 18 different times throughout the trial where the court, either intentionally or inadvertently, went off record. (R. 142, 184, 189, 192, 511, 514, 681, 757, 879, 925, 1041, 1351, 1490, 1548, 1558, 1560, .1633, 1674.)” (Shanklin’s brief, p. 46 n. 20.) Acr cording to Shanklin, these portions include “the jury striking process, the jury charge conference, and a large number of bench conferences.” (Shanklin’s brief, p. 46 (footnote omitted).)
Rule 19.4(a), Ala. R.Crim. P., provides:
“In all capital cases (criminal trials in which the defendant is charged with, a death penalty offense), the court reporter shall táke full stenographic notes of voir dire of the jury and of the arguments of counsel, whether or not such is ordered by the judge or requested by the prosecution or defense. This duty may not be abrogated by the judge or waived by the defendant.”
(Emphasis added.)
In Ex parte Land, 678 So.2d 224 (Ala. 1996), the Alabama Supreme Court addressed the precise issue Shanklin now raises on appeal:
“According to Land, [the omitted] portions of the trial include selection of the jury venire; striking the jury; conferences regarding the admissibility of testimony or exhibits offered by the State;. a conference that occurred just before Land waived his right to testify; a conference on jury instructions; and the polling of the jury at both phases of the trial.
“Land contends he was prejudiced by the lack of a complete transcription. He first argues that it prevented him from challenging the trial court’s methods used for selecting a venire and for striking the jury. Land contends that numerous objections he made to the admission of prosecution testimony or exhibits were not preserved. Finally, he argues that the failure to transcribe a conference that occurred just before he waived his right to testify prevented him from challenging that waiver as involuntary or unknowing^ ’'
[[Image here]]
“We conclude that there is no merit to Land’s claim of reversible error based on the lack of a complete transcript of his entire trial proceedings. In Hammond v. State, 665 So.2d 970, 972 (Ala. Crim.App.1995), the Court of Criminal Appeals stated that with regard to such a claim as Land now makes, the reviewing court ‘must determine whether a substantial right of the appellant has been adversely affected by [the] omission from the transcript.’ Further, this Court has ruled that even "where a transcript was lacking for a portion of the trial that should have been transcribed and the defendant’s appellate counsel had not been the defendant’s trial counsel, the .appellate court had to examine the existing record of the trial in order to determine whether the failure to transcribe that portion of the trial was only harmless error rather than reversible error. Ex parte Harris, 632 So.2d 543 (Ala.1993) (holding that although the failure to transcribe the voir dire examination of the jury was error, it was only harmless error, even when the trial court had granted the defendant’s motion to have all proceedings in all phases of the trial transcribed), affirmed, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995).
*755 “The portions of the trial that Land says were not transcribed involve selection of the jury venire and striking the jury; bench conferences among the trial judge, the prosecution, and defense counsel; or the polling of the jury....
■ “In Ex parte Harris, this Court noted that the phrase ‘arguments of counsel,’ as it is used in Rule 19.4(a), does not refer to ‘every incidental discussion between counsel and the trial judge that occurs at the bench,’ but, rather, refers only to counsel’s opening and closing arguments. 632 So.2d at 546. Thus, it is clear that Rule 19.4(a) did not require the court reporter to transcribe the various bench conferences now placed in issue by Land. Although Land.claims' error in the lack of a transcript of the court’s selection of the venire and of the actual striking of the jury, Rule 19.4(a) requires only transcription of the ‘voir dire of the venire,’ which was transcribed in full and which is part of the record in this case. Nor does Rule 19.4(a) require transcription of the polling of the jury. The transcript shows that both following the jury foreman’s pronouncement of the jury’s finding as to guilt and then, later following the foreman’s pronouncement of the jury’s recommended sentence, the court reporter made a contemporaneous notation indicating that the judge polled the jury.
. “It is important to note that Land did not request that all proceedings of the trial be transcribed and, as explained above, Rule 19.4(a) did not require that they all be transcribed. Thus, Land cannot argue that the trial court breached a legal duty with regard to the transcription of his trial. Moreover, Land is raising this issue for .the first time on appeal, and our review is subject to the plain error standard. After reviewing the record at the point of each transcript omission referenced by Land, we conclude that the lack of a complete transcription has not adversely affected his substantial rights., Thus, we find no plain-error.”
678 So.2d at 244-45.
Here, like- in Ex parte Land, Shanklin did not request that all trial proceedings be transcribed, and he is raising this issue for the first time on appeal; thus,- our review is only for plain error.
Although Shanklin argues that the jury-striking prócess was not transcribed, that the jury-charging conference was not transcribed, and that several bench conferences were not transcribed, as the Alabama Supreme Court explained in Ex parte Land, Rule 19.4(a), Ala. R.Crim. P., does not require that those portions of a capital trial be transcribed. Rule 19.4(a), Ala. R.Crim. P., instead, requires only that counsel’s “opening and closing arguments” and “ ‘voir dire of the venire’ ” be transcribed. Ex parte Land, 678 So.2d at 245. The transcript of Shanklin’s trial includes a full transcription of counsel’s opening and closing arguments, as well as voir dire and individual voir dire. Consequently, the circuit court complied with Rule 19.4(a), Ala. R.Crim. P., and Shanklin “cannot argue that the trial court breached a legal duty with regard to the transcription of his trial.” Ex parte Land, 678 So.2d at 245.
Additionally, we have reviewed the “record at the point of each transcript omission referenced by [Shanklin, and] conclude that the lack of a complete transcription has not adversely affected his substantial rights.”[8] Id. Thus, we find, no plain error.
*756 II.
Shanklin contends that the circuit court “improperly allowed [Shanklin’s] statements to come into evidence” (Shanklin’s brief, p. 68), because, he says, “[although [he] was under arrest, he was not Miran-dized ”[9] (Shanklin’s brief, p. 68) by Chief Bobo when Chief Bobo picked him- up at the Albertville Police Department to transfer him to the Walker County jail.[10]
Before trial, Shanklin moved to' suppress the statements he made to Chief Bobo, arguing:
“Judge, we’re asking that — Chief Bobo went to pick up [Shanklin] and in his investigative report he basically said that [Shanklin] made some comments to him that we believe should be suppressed and not be allowed to testify to at trial. In specific, it was Chief Bobo that drafted a detailed report regarding the transportation of [Shanklin]. In the report there are indications that statements were made by [Shanklin] to the officers.
“.,. There’s no evidence showing or tending to show that [Shanklin] was Mirandized at the time by Chief Bobo or Deputy Williams prior to or during the transportation of [Shanklin] from the Albertville Jail to Walker County.
“Judge, there was no evidence produced by the prosecution that [Shanklin] was Mirandized until he was back at the Walker County Jail on October 17[,] 2009, in the presence of Officer Softley and Frank Cole. We’re asking that any statement or testimony to these officers or investigators by [Shanklin] is a violation of [Shanklin’s] Miranda Rights and thus is inadmissible in the prosecution.
[[Image here]]
“... Judge, our argument was he was under arrest. They took him into custody, they had him in the police car and he was under arrest and they failed to read his Miranda Rights to him. We just don’t believe this should be used. It’s more prejudicial than it is probative as far as [Shanklin] is concerned.”
(R. 24-26.) The State, on the other hand, argued that Miranda was inapplicable because, the State said, Shanklin made “unsolicited statements to the officers” (R. 25), Shanklin was not asked any questions, Shanklin’s statements were “statements against interest” (R. 26), and Shanklin “had enough situations with the law where he’s been arrested ... where he knows and has plenty of knowledge dealing with the police so that he knows when he’s under Miranda what to say and when to say it and what not to say.” (R. 26-27.)
The circuit court, after hearing testimony from only Chief Bobo, denied Shanklin’s motion to suppress.
“““This Court reviews de novo a circuit court’s decision on a motion to suppress evidence when the facts are not in dispute. See State v. Hill, 690 So.2d 1201, 1203 (Ala.1996); State v. Otwell, 733 So.2d 950, 952 (Ala.Crim. App.1999).’ ” State v. C.B.D., 71 So.3d 717, 718 (Ala.Crim.App.2009) (quoting State v. Skaggs, 903 So.2d 180, 181 (Ala.Crim.App.2004)).
*757 “ ‘ “As our Supreme Court has stated:
“““The Fifth Amendment to the United States Constitution provides that “[n]o person ,.. shall be compelled in any criminal case to be a witness against himself.” U.S. Const. Amend. V. In Miranda [v. Arizona, 384 U.S. 436 (1966) ], the United States Supreme Court held that the right against self-incrimination “is fully applicable during a period of custodial interrogation.” 384 U.S. at 460. The Supreme Court in Miranda further held that “the right to have counsel present at the interrogation is indispensable to the protection of the Fifth Amendment privilege....” 384 U.S. at 469. Before a custodial interrogation, a suspect must be informed of these rights, now commonly referred to as Miranda rights. 384 U.S. at 444 (“Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.”). The Supreme Court in Miranda recognized that “the defendant may waive effectuation of these rights, provided that the waiver is made voluntarily, knowingly, and intelligently.” Id.’ ” ’
“Ward v. State, 105 So.3d 449, 452-53 (Ala.Crim.App.2012) (quoting Thompson v. State, 97 So.3d 800, 805 (Ala.Crim. App.2011), quoting in turn Ex parte Landrum, 57 So.3d 77, 81 (Ala.2010)). ‘To decide if a suspect is in custody, the court, looking at the totality of the circumstances, must find that a reasonable person in the suspect’s position would believe that he or she is not free to leave. Seagroves v. State, 726 So.2d 738, 742 (Ala.Crim.App.1998).”
Woolf v. State, [Ms. CR-10-1082, May 2, 2014] — So.3d -, - (Ala.Crim.App. 2014). Even if in custody, however,
“ ““ “ ‘[i]f the defendant spontaneously volunteers information, either before or after being given the Miranda warnings, those statements need not be suppressed.’ United States v. Edwards, 885 F.2d 377, 387 (7th Cir.1989). See also Crawford v. State, 479 So.2d 1349, 1352 (Ala.Cr. App.1985) (‘An unsolicited remark, not in response to any interrogation, does not fall within the Miranda rule.’); United States v. Lawrence, 952 F.2d 1034, 1036 (8th Cir.[1992]) (‘The protections afforded a suspect under [Miranda ] apply only when the suspect is both in custody and being interrogated. A voluntary statement made by a suspect, not in response to interrogation, is not barred by the Fifth Amendment and is admissible with or without the giving of Miranda warnings.’), cert. denied, 503 U.S. 1011, 112 S.Ct. 1777, 118 L.Ed.2d 434 (1992).
“ ““ “ ‘Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated_ Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [the holding in Miranda ].’
““““Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966). See also Britton v. State, 631 So.2d 1073, 1078 (Ala.Cr. *758 App.1993); Williams v. State, 601 So.2d 1062, 1072 (Ala.Cr.App. 1991)”””. . .
“Brown v. State, 982 So.2d 565, 601-02 (Ala.Crim.App.2006) (quoting Maples v. State, 758 So.2d 1, 42-43 (Ala.Crim.App. 1999) (additional citations omitted)).”
Woolf, — So.3d at - (emphasis added).
Although Shanklin correctly argues that he was in custody when he made statements to Chief Bobo at the Albertville Police. Department, the undisputed evidence _ at the suppression hearing'demonstrates that Shanklin was. not being interrogated by Chief. Bobo. Specifically, the evidence at the suppression hearing established that, on October 17, 2009, Chief Bobo and Investigator Ralph Williams had received from .the District Attorney’s Office felony arrest warrants for Shanklin and that-they drove to the Albertville Police Department to pick- up Shanklin. - According to Chief Bobo, he and Investigator Williams arrived at- the Albertville Police Department around 12:30 a.m., - placed Shanklin in handcuffs, and told Shanklin that he was under arrest. Chief Bobo testified, however, that he did not explain to Shanklin his Miranda rights. Indeed, Chief Bobo stated that he was instructed not to read Shanklin his Miranda rights and, instead, was only to
“transport [Shanklin], that Investigators Softley and Cole were going to do the official ihterview[,] and if he was hungry offer him a meal, but do not ask him any questions.”
(R. 33.) Chief Bobo testified that he asked Shanklin only whether he was hungry — to which Shanklin responded that he was— and testified that he purchased for Shank-lin a cheeseburger from the McDonald’s fast-food restaurant in Albertville.
Although Shanklin made statements to Chief Bobo at the Albertville Police Department,[11] Chief Bobo stated that he did not speak with Shanklin about the case, did not make Shanklin any promises or threats to induce him to make any statements about the case, and that Shanklin was not coerced in any way to make any statements about the case.
Because the undisputed evidence at the suppression hearing demonstrated that Shanklin made unsolicited statements to Chief Bobo, which were not in response to interrogation, Shanklin’s statements to Chief Bobo do not fall within the purview of Miranda. Consequently, the circuit court did not err when it denied Shanklin’s motion to suppress his statement to Chief Bobo as having been made in violation of Miranda.
III.
Shanklin contends that the circuit court erred when .it allowed “an improper and unduly suggestive [photographic] lineup into evidence.”[12] (Shank-lin’s brief, p. 1,6.) • Specifically, Shanklin argues that, in this case, the “identifica *759 tion ,was undoubtedly unduly suggestive,” because, he says,
“[t]wo days after the incident, Ashley met with the police officers Frank Cole, John Softly, and Kenneth Bobo at the Cordova police station. (R. 151, 629-30, 1531.) The police presented a stack of photographs to Ashley. (R. 153.) The large majority of the pictures had one photo on the top right, a rap sheet below and their names and addresses on the card. (R. 153-54.) Unlike the other photos with one (and in some instances two) picture(s) at the top, the card with [Shanklin] had three photos of him at the top. (R. 156.) Mr. Shanklin’s card was the only me to have three photos at the top. Id. Furthermore, there were at least three different Shanklins in the array of about thirty photos. (R. 163-64, 167.) The pictures Ashley pulled and initialed were those of [Kevin] and [Shanklin.] (R. 167-68,1167.)”
(Shanklin’s brief, p. 19 (emphasis added).) Shanklin further asserts that the factors set forth in the United States Supreme Court decision of Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), “weigh in favor of suppression,” (Shank-lin’s brief, p. 20.)
“In Cochran v. State, 500 So.2d 1161 (Ala.Cr.App.1984), we reviewed the legal requirements for determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony. In Cochran, we stated:
“ ‘There exists a due process right to the exclusion of unreliable identification testimony that results from procedures that are both unnecessarily suggestive and conducive to irreparable mistaken identification. Stovall v. Denno, 388 U.S. 293[, 87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967). The primary focus in the due process inquiry is on the reliability of the identification, and identification evidence derived from an unnecessarily suggestive source need , not be excluded if the totality of the circumstances indicates that it is reliable. Manson v. Brathwaite, 432 U.S. 98[, 97 S.Ct. 2243, 53 L.Ed.2d 140] (1977).
• “ ‘In Manson, the. Supreme Court adopted the five factors enumerated in Neil v. Biggers, 409 U.S. 188[, 93 S.Ct. 375, 34 L.Ed.2d 401] (1972), to determine the reliability of the identification:- the witness’ opportunity to view the criminal at the time of the crime; the witness’ degree of attention at the time of the crime; the accuracy of the witness’ prior description of the criminal; the witness’ level of certainty when identifying the suspect at the confrontation; and the length of time between the crime and the confrontation.
- “ ‘. After Manson, courts have employed a two-step analysis to determine whether due process has been violated by the admission of identification . testimony. “A • defendant first must prove that the identification procedure was unnecessarily and imper-missibly suggestive, and courts then will consider the reliability of the identification by balancing the Biggers factors against the suggestiveness of the procedure.” Project: Thirteenth Annual Review of Criminal Procedure: United States Supreme Court And Courts of Appeal 1982-83, 72 Geo. L.J. 249, 334 (1983), citing United States v. Briggs, 700 F,2d 408, 412 (7th Cir.), cert. denied, 461 U.S. 947, 103 S.Ct. 2129, 77 L.Ed.2d 1307, 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983); Brayboy v. Scully, 695 F.2d 62, 65 (2d Cir.1982), cert. denied, 460 U.S. 1055[, 103 S.Ct. 1505, 75 L.Ed.2d 934] (1983) (“Since the identi *760 fication procedure was not impermis-sibly suggestive, the issue of the reliability of Kolkmann’s identification of Brayboy is not before us.”); United States v. Harper, 680 F.2d 731, 734 (11th Cir.), cert. denied, 459 U.S. 916[, 103 S.Ct. 229, 74 L.Ed.2d 182] (1982) (“First, as a threshold inquiry, the Court must decide whether the identification procedure was unnecessarily suggestive. A finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of mis-identification.”).’
“500 So.2d at 1169.
“Thus, whenever the in-court identification of the defendant is challenged, the first inquiry is whether the out-of-court identification procedure used was unnecessarily or impermissibly suggestive; if it was not, then the inquiry stops. Cochran. Only when the pretrial procedures used are unnecessarily or impermissibly suggestive must we analyze the totality of the circumstances under the factors set out in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Coleman v. State, 487 So.2d 1380 (Ala.Crim.App.1986).”
Whitt v. State, 733 So.2d 463, 471-72 (Aa. Crim.App.1998) (footnote omitted).
Before trial, Shanklin moved to suppress Ashley’s “out-of-court and in-court identifications” of him because, he said, the out-of-court identification was “overly or im-permissibly suggestive.” (R. 149.)
At the hearing on the motion to suppress, Investigator Softley, a criminal investigator for the Walker County District Attorney’s Office, testified that “[Investigator] Cole had asked the chief, Kenneth Bobo, to see if he could compile a composite of black males ranging from different ages different heights, different weights and see if he could put all of that together and give it to [Investigator Softley] and [Investigator] Cole.” (R. 151.) Additionally, Investigator Softley stated that they included “young black males in that range that frequented Cordova and Parrish areas.” (R. 160.) Investigator Softley stated that at the time of the request they had a general description from Ashley — including that one of the individuals had “funny shaped ears” and a scar over one of his eyes — but they did not have any suspects. According to Investigator Softley, although typically he uses the Walker County Sheriffs Department to compile photo-identification lineups, he asked Chief Bobo to compile the lineup in this case because, he said, the “Cordova Police Department ... had the same operation that we would get out of the Sheriffs Department.” (R. 152.)
Investigator Softley stated that he met with Ashley on October 14, 2009, at the Cordova Police Department along with Investigator Cole, Chief Bobo, and “another officer” (R. 151), and, at that time, they provided Ashley with a photographic lineup. According to Investigator «Softley, the photo lineup consisted of a collage of 10 photographs and 20 additional “individual photographs that[ are] on LETS[13] readouts].” (R. 167.) Regarding the “LETS readouts],” Investigator Softley testified that the'majority of the individuals on the readouts have a picture at the top of the sheet followed by their name, address, and “rap sheet.” Investigator Softley conceded, however, that, although Shanklin’s readout like the other readouts also had his name, address and “rap sheet,” Shank-lin’s readout differed from the other readouts because it included three photographs *761 of Shanklin on the front page of the readout. Investigator Softley, on cross-examination, however, explained that other readouts had multiple photographs, including two readouts that had two photographs on the front page and another readout that had two photographs on the front page and an additional photograph on a second page.
According to Investigator Softley, Investigator Cole placed the photographs' on a table in front of Ashley, and she began looking through the photographs. Investigator Softley testified that Ashley quickly picked Shanklin out of the lineup and, thereafter, picked Kevin, whom, according to Investigator Softley, Ashley identified as the “killer.” (R. 168.) Investigator Softley stated that Ashley “appeared to be emotional” when she picked the photographs out of the lineup.
Investigator Softley testified that he did not believe that the fact that Shanklin’s photograph appeared three times on the readout was suggestive. Additionally, Investigator Softley stated that he did not believe that the appearance of a “rap sheet” on the readouts was suggestive.
Gilbert Jean, a police officer with the Jasper Police Department, testified that he has compiled “[o]ver a hundred, maybe two hundred” photo lineups in his 83-year career as a law-enforcement officer. According to Officer Jean, he typically uses the following procedure when compiling a photo lineup and then presenting that lineup to a witness:
“If I have a witness, I want to use five or six pictures. -And, in faet, a lot of times I use a folder like this, no names, no addresses, just put the pictures in there and show it to them, if I have a suspect.”
(R. 176.) Officer Jean stated that, in his opinion, the photo lineup used in this case “is an awful lot of pictures to show a witness,” that he would not include “rap sheets” on the photographs, and that “the only way you would do something like this is if they actually didn’t have a suspect.” (R. 177.) Officer Jean explained:
“[A] lot of police departments have big books with hundreds of people in there. And I’ve doné it myself on occasion where if you don’t have a clue who did your crime and then they look through the book, picture after picture and then, you know, if they could pick one out.”
(R. 177-78.) Officer Jean further testified that a “rap sheet” with three photographs at the top could be suggestive because the witness “could think that that’s, a special person because they’ve got three pictures in there and the rest of them have got one.” (R.. 178.)
At the close of the testimony .at the suppression hearing, Shanklin argued that the out-of-court identification was unduly suggestive because, he said, his “picture was across the top of these information sheets three times.” (R. 184.) The circuit court, without making any findings, denied Shanklin’s motion.
Based on the testimony presented at the suppression hearing, the circuit court did not err when it denied Shanklin’s motion to suppress because the out-of-court identification procedure used in this case, even if suggestive, was not “so suggestive as to give rise to a substantial likelihood of misidentification.” Ex parte Johnson, 620 So.2d 709, 712 (Ala.1993) .(citing Ex parte Stout, 547 So.2d 901 (Ala. 1989)).
Here? Shanklin argues that the photo lineup was unduly suggestive only because, he says, his photograph appears three *762 times at,the top of .a readout.[14] As noted above, however, Shanklin’s readout was not the only readout that contained multiple photographs. In fact, contrary to Shanklin’s assertion, Kevin’s readout also included three photographs of him on the front page. Additionally,- the photo lineup included at least three other readouts that had an individual’s photograph that appeared multiple times on the front page— one of which had a third photograph on a second page. Furthermore, although Shanklin correctly asserts that his photograph appears three times at the top of a readout, the three photographs of Shanklin are identical.
Additionally, after reviewing the photographs presentéd to Ashley, we cannot say that there is any other basis for concluding that the photo lineup was “so suggestive as to give rise to a substantial likelihood of misidentifícation.” Specifically, the photographs in both the collage and the individual readouts similarly depict young African-American'males with similar features and builds, the majority of which are front-facing photographs of the shoulders and head with a blue background.[15] Additionally, the individual readouts are similar in that they each include the name of the individual and also include an address, a driving history, and a criminal history.
Thus, under the circumstances of this case, we cannot conclude that the circuit court erred when it denied Shanklin’s motion to suppress the photo lineup because, as explained above, although the readout containing Shanklin’s photographs'includes multiple photographs of Shanklin, that fact does ntit render the photo lineup “so suggestive as to give rise to a substantial likelihood of misidentifícation” — especially considering that, at the ■ time the lineup was. created and given to Ashley, the investigators had no suspects and compiled.a photo lineup based only on Ashley’s descriptions of the intruders.
Moreover, even if the procedures used by law enforcement in this case had been “so suggestive as to give rise to'a substantial likelihood of misidentifícation,” Ashley’s identification was reliable under the factors enumerated in Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).
“ ‘ “ ‘If [the identification procedure] is found to have been [unnecessarily or impermissibly suggestive], the court must then proceed to - the question whether the procedure found to have been “unnecessarily” or “impermissibly” suggestive was so “conducive to irreparable mistaken identification” ... or had such a tendency “to give rise to a very . substantial likelihood of irreparable misidentifícation” ... that allowing the witness to make an in-court identification would be a denial of due process.’ United States ex rel. Phipps v. Follette, 428 F.2d 912, 914-15 (2d Cir.1970).”
“ ‘Brazell v. State, 369 So.2d [25,] 28-29 [(Ala.Crim.App.1978)] .... See also Donahoo v. State, 371 So.2d 68, 72 (Ala.Crim.App.1979). In evaluating the likelihood of misidentifícation, the court must consider the following factors:
“‘“[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness’s degree of attention, [3] the accuracy of *763 the witness’s prior description of the criminal, [4] the level of certainty demonstrated by the witness at the confrontation, and,[5] the length of time between the crime and the confrontation.”
“ ‘Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401, 411 (1972) — See also Ex parte Frazier, [729 So.2d 253 (Ala.1998)
“Ex parte Appleton, 828 So.2d [894,] 900 [ (Ala.2001) ].” -'
Dotch v. State, 67 So.3d 936, 955 (Ala. Crim.App.2010).
Here, Ashley had the opportunity to observe both Shanklin and Kevin in her bedroom at the time of the offense. Specifically, Ashley’s testimony at trial demonstrated that Shanklin and Kevin woke Ashley when they entered her and Michael’s bedroom; that she was able to see that the individual wearing the bandana who put the silver .32-caliber revolver to her head had “[l]ight skin ... [and] [h]e had a scar on the right side of his face” (R. 609); that after the other individual shot Michael she fought that individual; and that, during the fight, she turned on the bedroom lights and, because the individual’s ski mask came off during the struggle, she was able to see the side of his face.
Ashley also testified at trial that she was able “to get a pretty good look” at the individual that put the gun to her head and was able to describe him as having a scar on the right side of his face, “ ‘which indicates a fair degree of attention on [Ashley’s] part.’” Dotch, 67 So.3d at 956 (quoting Hull v. State, 581 So.2d 1202, 1206 (Ala.Crim.App.1990)). Additionally, Ashley testified that she was able to get a “good took” at the other individual when she caught him in the doorway and turned the light on. In fact, Ashley stated that, she turned the light on specifically so she could “get a better took.” (R. 614.)
Ashley also provided law enforcement with a detailed and accurate description of the individuals she saw in her apartment.Specifically; Ashley testified that, while she was in the hospital, she told the, investigators that
“they were two black males, both wearing masks, dark clothing, anywhere from 5'11" to maybe 6 feet tall.
[[Image here]]
“I told them they were small in size.
[[Image here]]
“... I told them that the guy at the foot of the bed had a scar on the right side of his face, kind of, I told them they both kind of had big ears.”[16]
(R. 625.)
Although Ashley did not testify to her degree of certainty when she identified Shanklin and Kevin in the photo lineup, Chief Bobo testified that Ashley
“was flipping through the stack of photographs and she immediately recognized one photograph and said, ‘Oh my God, this is one of them,’ and become very hysterical, excited. She kept on flipping through the photographs, flipped through inaybe five or ten more, found ■another picture and said, ‘This is the other one, this is the other one,’ and she started crying. You know, we had to *764 give her a few moments to recoup herself.”
(R. 1165-66.) Chief Bobo’s testimony suggests that Ashley was certain in her identification.
Finally, Ashley’s identification occurred within a short time after the crime. At trial, the testimony established that Michael was killed in the early morning hours of October 12, 2009, and within two days Ashley had been presented a photo lineup and had identified Shanklin.
Based on the testimony presented at trial, the circuit court correctly denied Shanklin’s motion to suppress the out-of-court identification because Ashley’s identification was sufficiently reliable.
IV.
Shanklin contends that the State used its peremptory strikes in a racially discriminatory manner in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Shanklin raised his Batson objection in the circuit court, which concluded that Shanklin failed to establish a prima facie case of racial discrimination.
“In evaluating a Batson ... claim, a three-step process must be followed. As explained by the United States Supreme Court in Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003):
“ ‘First, a defendant -must make a prima facie showing that a peremptory challenge has been exercised on the basis of race. [Batson v. Kentucky,] 476 U.S. [79,] 96—97[, 106 S.Ct. 1712, 1723 (1986) ]. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Id., at 97-98. Third, in light of the parties’ submissions, the trial court must determine whether the defendant has shown purposeful discrimination. Id., at 98.’
“537 U.S. at 328-29.
“With respect to the first step of the process — the step at issue here — ‘[t]he party alleging discriminatory use of a peremptory strike bears the burden of establishing a prima facie case of discrimination.’ Ex parte Brooks, 695 So.2d 184, 190 (Ala.1997) (citing Ex parte Branch, 526 So.2d 609, 622 (Ala. 1987)). ‘A defendant makes out a prima facie case of discriminatory jury selection by “the totality of the relevant facts” surrounding a prosecutor’s conduct during the defendant’s trial.’ Lewis v. State, 24 So.3d 480, 489 (Ala.Crim. App.2006) (quoting Batson, 476 U.S. at 94), aff'd, 24 So.3d 540 (Ala.2009). ‘In determining whether there is a prima facie case, the court is to consider “all relevant circumstances” which could lead to an inference of discrimination.’ Ex parte Branch, 526 So.2d at 622 (citing Batson, 476 U.S. at 93, citing in turn Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976)). In Ex parte Branch, the Alabama Supreme Court specifically set forth a number of ‘relevant circumstances’ to consider in determining whether a prima facie case of race discrimination has been established:
“‘The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
“‘1. Evidence that the “jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.” [People v.] Wheeler, 22 Cal.3d [258] at 280, 583 P.2d [748] at 764, 148 CaLRptr. [890] at 905 [ (1978) ]. For instance “it may *765 be significant that the persons challenged, although all black, include both men and women and are a variety of ages, occupations, and social or economic conditions,” Wheeler, 22 Cal.3d at 280, 583 P.2d at 764, 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
‘“2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson[ v. Kentucky ], 476 U.S. [79] 97, 106 S.Ct. [1712] 1723, 90 L.Ed.2d 69 [(1986)].
“ ‘3. The past conduct of the state’s attorney in using peremptory challenges to strike all blacks from the jury venire. Swain[ v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965) ].
“‘4. The type and manner of the state’s attorney’s questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
“ ‘5. The type and manner of questions directed to the' challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct. App.1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal. Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
“ ‘6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same' or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
“ ‘7. Disparate examination of members of the venire; e.g., in Slap- ■ py,.& question designed to provoke a certain response that is likely to dis- ■ qualify a juror was asked to black jurors,, but not to white jurors. Slappy, 503 So.2dat 355.
• “ ‘8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. [229] at 242, 96 S.Ct. [2040] at 2049, 48 L.Ed.2d 597 [ (1976) ]. '
“‘9. The state used peremptory challenges to dismiss all or most black jurors.' See Slappy, 503 So.2d at 354, Turner, supra.’
“[526 So.2d] at 622-23.”
Kelley v. State, [Ms. CR-10-0642, March 14, 2014] — So.3d -, - (Ala.Crim. App.2014). Additionally, although in Ex parte Branch the Alabama Supreme Court set out “relevant circumstances” that may establish a prima facie case of racial discrimination,
“[t]he Alabama Supreme Court and this Court have consistently held that numbers alone cannot establish a prima facie case of discrimination in jury selection. For example, in Williford v. Emerton, 935 So.2d 1150, 1157 (Ala.2004), the Alabama Supreme Court stated:
‘“This Court has repeatedly listed the different ways a party can establish a prima facie case of discrimination for purposes of a Batson claim; however, the Willifords instead relied •upon “numbers alone.” For that reason, the trial court properly determined that the Willifords had not established a prima facie case and denied their Batson motion without *766 requiring the Emertons to provide race-neutral reasons for their strikes.’
“See also Blackmon v. State, [7 So.3d 397, 413] n. 2 (Ala.Crim.App.2005) (‘Numbers alone are not sufficient to establish a prima facie case of discrimination. The circuit court • could have properly denied Blackmon’s Batson motion without hearing the State’s reasons for removing the black prospective jurors. Sharrief v. Gerlach, 798 So.2d 646 (Ala.2001).’).”
Gissendanner v. State, 949 So.2d 956, 961—62 (Ala.Crim.App.2006).
At trial, Shanklin raised , the following Batson objection:
“[Shanklin’s trial counsel]: Judge, I would. I would like to challenge the prosecution on the strike of juror number 32. [Potential juror W.L.], she was number 32. We would like under Bat-son v. Kentucky, we would like for the prosecution to produce a race-neutral reason why they struck this juror.
“THE COURT: [Shanklin’s trial counsel], you must' first establish a pri-ma facie case of purposeful discrimination before the burden shifts to the State.
“[Shanklin’s trial counsel]: Yes, sir. I’m sorry.
“Judge, there were fifty-two (52) jurors of-which we only had five (5) African-Americans. The jury that we have chosen has only two (2) African-Ameri- ■ cans out of twelve (12).
“THE COURT: I think you have failed to establish a prima facie case of purposeful discrimination by the other party.”
(R. 516-17.) Similarly,' on appeal, Shank-lin argues:
“There were fifty-two people on the venire and 48 after for cause strikes. (C. 103, 510 — 11.) Only five of the forty-eight were African Americans. (C. 516.) The jury consisted of 12 jurors and two alternates. Id. That means a little more than 10% of the venire was African American. The State struck at least one African American. The State therefore, removed at least 20% (one of five) of the , African Americans from the venire.”
(Shanklin’s.brief, pp. 33-34.)
Thus, Shanklin, both at trial and on appeal, relies on “numbers alone” to establish a prima facie case of racial discrimination, which is insufficient. See Gissendanner, 949 So.2d at 961-62.[17] :Thus, the *767 circuit court “properly denied [Shanklin’s] Batson motion without [requiring] the State’s reasons for removing the black prospective jurors.” Blackmon v. State, 7 So.3d 397, 413 n. 2 (Ala.Crim.App.2005).
Moreover, even if we had determined that Shanklin’s “numbers alone” were sufficient to establish a pattern of discrimination, the State, even though not required to by the circuit court, offered a race-neutral reason for striking prospective juror W.L.
As set out above, Shanklin challenged only the State’s strike of prospective juror W.L. After the circuit court concluded that Shanklin failed to establish a prima facie ease of racial discrimination, the State offered the following reason for striking prospective juror W.L.:
“Now, [prospective juror W.L.] that is on this — that’s the subject of what' his objection is, she had two family members that have been prosecuted, one by my office. ■ And so, I don’t even think— first of all, there’s no prima facie case if he’s arguing about [prospective juror W.L.] She had a family member that’s being prosecuted by my office and she had another family member prosecuted by Jefferson County, specifically.”
(R. 516-17.)
This Court has held:
“‘[P]revious criminal charges, prosecutions, or convictions of potential jurors or their relatives [is] a race-neutral rea- . son.... ’ Johnson v. State, 43 So.3d 7, 12 (Ala.Crim.App.2009). See also Lee v. State, 898 So.2d 790 (Ala.Crim.App. 2001); Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000); Thomas v. State, 611 So.2d 416 (Ala.Crim.App.1992).
Thompson v. State, 153 So.3d 84, 127 (Ala. Crim.App.2012) (emphasis added) , (as modified on. denial of application for rehearing). , Thus, the State’s proffered reason for striking prospective juror W.L. was race neutral. Accordingly, the circuit cqurt properly. denied Shanklin’s Batson motion.
Shanklin," as a sub-argument to his Bat-son claim, also argues that “[t]he striking process was not transcribed,” which, he says, is unconstitutional because “[w]e do not know how many strikes each side had[;] [w]e do not know how those strikes were executed[; and] [w]e are left guessing as to who struck whom.” (Shanklin’s brief, p. 35.) Although Shanklin cites no authority in support of his claim, see Rule 28(a)(10), Ala. R.App. P., his claim is refuted by the record on appeal. Specifically, the record- on appeal includes the transcription of the proceedings, which includes voir dire, individual voir dire, and Shanklin’s Batson motion. Although the process of striking the jury was accomplished off the record, the record on appeal contains the jury-strike list — which indicates both the gender and race of each individual juror — and a list of the individual strikes made by each party. (Supplemental Record on Appeal, G. 7-11.) Thus, Shanklin’s claim is refuted by the record on appeal and he is not entitled to relief on his Batson claim.
V.
Shanklin contends that the circuit court erred “by death qualifying the jury venire[,] which produced a conviction-prone jury.”[18] (Shanklin’s brief, p. 77.) Shanklin did not file a pretrial motion or otherwise object to death-qualifying the prospective jurors. This Court, therefore, reviews this issue for plain error.
Here, the circuit court did not erf in death-qualifying the prospective jurors. *768 Moreover, doing so did not result in a death-prone jury. This argument has been addressed previously and decided adversely to Shanklin:
“In Davis v. State, 718 So.2d 1148 (Ala.Crim.App.1995) (opinion on return to remand), aff'd, 718 So.2d 1166 (Ala. 1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999), we stated:
“ ‘A jury composed exclusively of jurors who have been death-qualified in accordance with the test established in Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), is considered to be impartial even though it may be more conviction prone than a non-death-qualified jury. Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996). See Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Neither the federal nor the state constitution prohibits the state from ... death-qualifying jurors in capital cases. Id.; Williams; Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).’
“718 So.2d at 1157. There was no error in allowing the State to death qualify the prospective jurors.”
Brown v. State, 11 So.3d 866, 891 (Ala. Crim.App.2007). Because death-qualifying prospective jurors is permissible, there was no error.
VI.
Shanklin contends that his convictions and sentence should be reversed because, he says, Rule 615, Ala. R. Evid., was “properly invoked but not followed.”[19] (Shanklin’s brief, p. 66.) Specifically, Shanklin contends that it was error to allow Investigator Softley, Chief Bobo, and Lori Crumpton — Michael’s mother — to remain at counsel table throughout trial. Because Shanklin did not object to the presence of these individuals during trial, we review his claim for plain error. See Centobie v. State, 861 So.2d 1111, 1130 (Ala.Crim.App.2001) (explaining that when an appellant fails to object to a person’s presence in the courtroom during trial our review is limited to plain error).
Initially, we question whether Shanklin, in fact, invoked Rule 615, Ala. R. Evid., for purposes of the guilt phase of his trial. The record on appeal establishes that before trial the circuit court conducted a hearing on Shanklin’s “motion to suppress out-of-court and in-court identification.” (R. 148.) Before the hearing on the motion to suppress, Shanklin invoked Rule 615, Ala. R. Evid. After hearing the testimony of Investigator Softley and Officer Gilbert Jean, the circuit court denied Shanklin’s motion. Thereafter, the circuit court entertained additional arguments raised by Shanklin and then conducted individual voir dire. After the jury was selected, empaneled, and sworn, the circuit court recessed until the following morning. When the parties returned the following morning to start the guilt phase of his trial, Shanklin did not invoke Rule 615, Ala. R. Evid. Thus, it appears, Shanklin invoked Rule 615, Ala. R. Evid., for only the hearing on his motion to suppress — not for trial.[20]
*769 Regardless, even if Shanklin had invoked Rule 615, Ala. R. Evid., or if we interpret Shanklin’s invocation of Rule 615 at the suppression hearing as properly invoking Rule 615 for purposes of trial, he would not be entitled to relief on this claim.
“Generally, a trial court may exclude witnesses from the courtroom. See Rule 9.3(a), Ala. R.Crim. P. However, with regard to the right of family members of victims to be present in the courtroom, § 15-14-56(a), Ala.Code 1975, provides:
“ ‘Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death ... the victim’s family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article.’
“See also Wilson v. State, 777 So.2d 856, 930 (Ala.Crim.App.1999) (a victim of a criminal offense is entitled to be present in any court exercising any jurisdiction over the offense, and may not be excluded from any hearing or trial that pertains to the offense merely because the victim has been or may be subpoenaed to testify at such hearing or trial, § 15-14-51, Ala.Code 1975; additionally, the victim is ‘ “exempt from the operation of rule of court, regulation, or statute requiring the separation or exclusion of witnesses from court in criminal trial or hearings,” ’ § 15-14-55, Ala.Code 1975). Rule 615, Ala. R. Evid., provides:
‘“At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rale does not authorize exclusion'of ... a victim of a criminal offense or the representative of a victim who is unable to attend....’”
Centobie, 861 So.2d at 1130. Additionally, with regard to the presence of law-enforcement officers during trial, we have recognized that,
“[i]n Ex parte Lawhorn, 581 So.2d 1179, 1181 (Ala.1991), the Alabama Supreme Court stated that ‘Alabama appellate courts have time and again refused to hold it an abuse of discretion on the part of the trial court to allow a sheriff, police chief, or similarly situated person who will later testify to remain in the courtroom during trial’ See also Jackson v. State, 502 So.2d 858 (Ala.Crim.App.1986); Johnson v. State, 479 So.2d 1377 (Ala.Crim.App.1985); Chesson v. State, 435 So.2d 177 (Ala. Crim.App.1983), and authorities cited in those cases.”
Centobie, 861 So.2d at 1130 (emphasis added). See also Living v. State, 796 So.2d 1121, 1141-42 (Ala.Crim.App.2000).
Although Shanklin correctly notes that Lori Crumpton, Chief Bobo, and Investigator Softley were present during the trial and were not excluded from the proceedings under Rule 615, Ala. R. Evid., we cannot conclude that, in allowing Lori to be present at trial as the representative of Michael, Chief Bobo to be present as the chief of the Cordova Police Department, or Investigator Softley to be present as the lead investigator, the circuit court abused its discretion. Moreover, as noted above, Shanklin did not object to the presence of those individuals at trial and, after examining the record, we cannot conclude that their presence at trial adversely affected a *770 substantial - right of Shanklin. Thus, Shanklin is not entitled to relief.on this, claim.
VIL
Shanklin contends that, the circuit court erred when it “allowed numerous items into evidence that were both irrelevant and unduly prejudicial.”[21] (Shanklin’s brief, p. 25.) Specifically, Shanklin argues that the circuit court erred in admitting certain photographs, a police report, and cellular-telephone records. (Shanklin’s brief, pp. 25-32.) Shanklin failed.to raise some of his arguments in the circuit court; thus, we examine those arguments under the plain-error rule. See Rule 45A, Ala. R.App. P. Shanklin did, however, file pretrial motions and object at trial as to some of the claims he now presents on appeal. We note the particular instances as we address them.
Initially, we recognize that Rule 401, Ala. R. Evid., provides:
“ ‘Relévant evidence’ means evidence having- any tendency to make the existence. of any fact that is of consequence to the determination of the action more probable or less probable than it. would be without the evidence.”
Rule 402, Ala. R. Evid., provides:
“All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute; by, these rules, or by other rules applicable in the courts of this State. Evidence which is not relevant is not admissible.”
Rule 403, Ala. R. Evid., provides:
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence,”
(Emphasis added.) Also, it is well settled that
“‘“[t]he admission or exclusion of evidence is a matter within the sound discretion of the trial court.” Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim. App.2000), aff'd, 808 So.2d 1215 (Ala. 2001). “The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not-be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000),’ ”
Harris v. State, 2 So.3d 880, 927 (Ala. Crim.App.2007) (quoting Gavin v. State, 891 So.2d 907, 963 (Ala.Crim.App.2003)). With these principles in mind, we address Shanklin’s specific claims on appeal.
A.
Shanklin contends that the circuit court erred when it admitted allegedly “irrelevant and prejudicial photos” (Shanklin’s brief, p. 26); specifically, “prejudicial photos of the victim’s children” (Shanklin’s brief, p. 26) and “duplicative autopsy photos.” (Shanklin’s brief, p. 29.)
The following is well settled:
“ ‘Generally, photographs are admissible into evidence in a criminal prosecution “if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge.” Magwood v. State, 494 So.2d *771 124, 141 (Ala.Cr.App.1985), aff'd, 494 So.2d 154 (Ala.1986), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). See also Woods v. State, 460 So.2d 291 (Ala.Cr.App.1984); Washington v. State, 415 So.2d 1175 (Ala.Cr.App. 1982); C. Gamble, McElroy’s Alabama Evidence § 207.01(2) (3d ed.1977).’ ”
Sneed v. State, 1 So.3d 104, 131-32 (Ala. Crim.App.2007) (quoting Bankhead v. State, 585 So.2d 97, 109 (Ala.Crim.App. 1989)).
1. Photographs of Michael’s Children
Shanklin contends that the circuit court erred when it admitted State’s Ex-, hibit 8, which includes a total of five photographs: (1) two photographs of Michael while he was alive with his daughter; (2) one photograph of Michael while-he was alive with his “Mee-maw,” -his' “Nanna,” and his daughter; (3) a photograph of Michael’s daughter asleep in her bedroom in the apartment; and (4) a photograph of Michael in his casket at the funeral home.[22]
Before trial, Shanklin moved to suppress “four photographs,” which, he described, as “pictures of a little girl sleeping in a bed.” (R. 530.) Shanklin argued that “they are not probative at all,” that they “are definitely prejudicial,” that they “don’t have anything .to do with the case,” that they “weren’t taken .... at the time of the incident,” and that they “are meant to inflame the jury or impassion the jury to prejudice [Shanklin].” (R. 530.)
The State, on the other hand, argued that the pictures were relevant to show where the two children were in the apartment at the time Michael was killed and that they' would aid Ashley’s testimony “showing where her kids were and why they had been moved.” (R. 531.) Additionally, the State argued that ■ the photographs of the children in the bedroom were probative to “show[ ] the bloodthristiness of these two men and what they did and plus to show the factual basis of where these children were in relation to the shootings.” (R. 532.) After explaining how the photographs of the children in the bedroom would aid the testimony at trial, the State agreed to show only one photograph of the children in the bedroom, and it “withdr[e]w the rest.”[23] (R. 534.)
At trial, the State introduced only one picture of Michael’s daughter sleeping in her bedroom as part of State’s Exhibit 8— which, as noted above, included four other photographs, and Shanklin renewed his pretrial objection.
With regard to the photograph of Michael’s daughter sleeping in her bed, Ashley testified as follows:
“[Prosecutor]: Now, the last one. Do you. recognize, that?
■ “[Ashley]: Yes, I do.
*772 “[Prosecutor]: What is that?
“[Ashley]: [My daughter] asleep in her bedroom in the apartment.
“[Prosecutor]: So, we have seen the diagram earlier during opening statement that had the floor plan, and I asked you about the floor plan a few minutes ago. Is this a picture inside the children’s bedroom?
“[Ashley]: Yes, sir.
“[Prosecutor]: And it has a date of February 20, 2009. Do you know as you sit here today whether or not that—
“[Ashley]: That is accurate.
«
“[Prosecutor]: All right. That door there in the background, which door would that be?
“[Ashley]: That would be their closet door.
“[Prosecutor]: Now, in relation to your bedroom, if you’re looking at the crib as it was in the apartment, which direction to your left or right would be your bedroom?
“[Ashley]: It would be to the right if you were standing sideways of her bed.
“[Prosecutor]: So, it would be to the right of that photograph as we’re looking at the photograph?
“[Ashley]: Uh-huh.”
(R. 578-79.) Ashley also testified that the shooting occurred in her bedroom and that when the shooters left the apartment she noticed that her eldest child had been moved from her bed into the crib with her youngest daughter.
Based on the testimony presented at trial, this complained-of photograph was relevant to establish the children’s proximity to the shooting as well as to demonstrate where the children were located after the shooting occurred. Moreover, although Shanklin contends that this photograph was used only to inflame the jury, “photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.” Ex parte Siebert, 555 So.2d 780, 784 (Ala. 1989) (citing Hutto v. State, 465 So.2d 1211, 1212 (Ala.Crim.App.1984)). Accordingly, the circuit court did not err when it admitted this photograph.
With regard to the photographs of Michael while he was alive, both with his daughter and with his “Mee-maw” and “Nanna,” Shanklin did not first object to these three specific photographs in the circuit court. As noted above, Shanklin, before trial, moved to suppress four photographs of Michael’s children sleeping in their bedroom. Shanklin did not, however, move to suppress any photographs of Michael with his daughter or of Michael with his “Mee-maw” and “Nanna.” Additionally, although Shanklin did object to the introduction of State’s Exhibit 8, he did so only on the basis of renewing his pretrial objection to the photographs of the children in the bedroom. Thus, we examine this claim for plain error.
“ ‘In Jolly [v. State, 395 So.2d 1135 (Ala.Crim.App.1981) ], citing McEl-roy’s Alabama Evidence, this court held:
“““It generally is agreed that the photograph of the victim of the homicide, taken before the alleged murder, is admissible for the purpose of identification. This is usually admitted in connection with the testimony of a witness who saw the alleged deceased at the time of the killing and who is called upon to identify the deceased as the person in the photograph. The foregoing decisions which admit the victim’s photograph into evidence for the purpose of identification are applicable even though there exists no *773 dispute over the identity of the deceased. (citing Luschen v. State, 51 Ala.App. 255, 284 So.2d 282 (1973) (not error to introduce “angelic” looking picture of deceased); Boyd v. State, 50 Ala.App. 394, 279 So.2d 565 (1973); Sanders v. State, 202 Ala. 37, 79 So. 375 (1918)).’ ”
“ ‘395 So.2d at 1142.’
“Burgess v. State, 827 So.2d 134, 187 (Ala.Crim.App.1998), affirmed, 827 So.2d 193 (Ala.2000), cert. denied, 537 U.S. 976, 123 S.Ct. 468, 154 L.Ed.2d 335 (2002). See Taylor v. State, 666 So.2d 36, 66 (Ala.Crim.App.1994) (finding no plain error in the admission during the guilt phase of a photograph of the victims in front of a Christmas tree). See also Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000) (finding no plain error in admission during the guilt phase of the victims in front of their boat because it was relevant to show, among other things, that they were alive before the offense).”
McMillan v. State, 139 So.3d 184, 226-27 (Ala.Crim.App.2010).
These three photographs, although depicting Michael with his daughter and other relatives, were used at trial for. Ashley and Lori Crumpton to identify Michael. Thus, we cannot conclude that there was error, much less plain error, when the circuit court admitted these photographs.
2. Autopsy Photographs
Shanklin contends that the circuit court improperly admitted, over his objection, “autopsy photos, that were unnecessarily duplicative.” (Shanklin’s brief, p. 29.)
Before trial, Shanklin moved to suppress the autopsy photographs, arguing:
“Well Judge, we’ve got some photos that were delivered to us on October 11th via CD, Judge. They’re autopsy photos. I don’t have copies of them with me. I don’t know if the prosecutor does ■ or not.

U

“But basically, Judge, what these photos are, they’re photos of Mr. Crumpton lying out on a gurney. In particular there is one gruesome photo. And we would really like the Court to view these before you make a decision.
[[Image here]]
“The Court: How many photos are we talking about, [Shanklin’s trial counsel,] here?
“[Shanklin’s trial counsel]: Judge, I do believe it’s about ten. Is that right?
“[Prosecutor]: Well, I think there’s 57 total autopsy photos.

U

“The Court: Okay.
“And [Shanklin’s trial counsel], are you asking the court to suppress all 57 photos?
“.[Shanklin’s trial counsel]: No, Judge. We really weren’t. There were photos in particular that were really graphic in nature. The victim was depicted in the nude in partially dismembered autopsy photos. We just believe they’re being introduced, if they’re introduced, to enrage and shock the jury. They’re sensitive in nature. Judge. And I know they’re saying 57. The last disk we got from them, if my memory serves me, and I should have brought it with me, it’s ten or twelve photos, Judge, in particular. And there’s actually a dissected part of the body on a gurney. And it’s just horrendous. It’s just horrendous.”
(R. 184-86 (emphasis added).) At trial, the State introduced all 57 autopsy photographs as State’s Exhibit 4, and Shanklin “renewfed] [his] pretrial objection to these photos being admitted.” (R. 1424-25.)
*774 Initially, we note that Shanklin, although indicating that he did not object to all the State’s autopsy photographs, did not indicate which of the State’s 57 autopsy photographs he objected to; thus, we review the circuit court’s admission of those photographs for plain error.
With regard to autopsy photographs, this Court has explained:
“‘This court has held that autopsy photographs, although- gruesome, are admissible to show the extent of a victim’s injuries,’ Ferguson v. State, 814 So.2d 925, 944 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001). ‘ “[A]u-topsy photographs depicting the character and location of wounds on a victim’s . . body are adniissible even if they' are gruesome, cumulative, or relate to an undisputed matter.” ’ Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to, 851 So.2d 453 (Ala. 2002)....”
Brooks v. State, 973 So.2d 380, 393 (Ala. Crim.App.2007).
Here, the autopsy photographs admitted as State’s Exhibit 4, although duplicative and gruesome, were used to aid Dr. Ward’s testimony in demonstrating the “character and location” of the gunshot wounds Michael received, “the extent of [Michael’s] injuries,” and the cause of Michael’s death — all of which were necessary for the State to meet .its burden of proof. Thus, the circuit court did not commit any error, much less plain .error, when it admitted State’s Exhibit 4. Consequently, Shanklin is not entitled to relief as to this claim.[24]
B.
Shanklin contends that the circuit court “reversibly erred by allowing police reports [to] be read into the record as a business record.” (Shanklin’s brief, p. 30.) Specifically, Shanklin argues:
“On two separate occasions, the trial court, in the absence of a defense objection, improperly allowed Chief Bobo.to read into evidence an incident report and a police report or statement. (R. 1135-37, 1144-45.) The court apparently allowed this evidence in under the business record exception.”
(Shanklin’s brief, p. 30.) As set out in his argument, Shanklin did not object to the testimony regarding the complained-of “incident report” and “police report” being read into the record; thus, we review this claim for plain error.
Shanklin takes issue with two portions of Chief Bobo’s trial testimony. Shanklin first contends that the circuit court erred when it allowed Chief Bobo to testify as follows:
“[Prosecutor]: I’m going to show you again what has been marked as State’s Exhibit Number 71 and ask you are you familiar with a lady by the name of Karen Nicholson?
“[Chief Bobo]: Yes, I am.
“[Prosecutor]: How do you know Ms. Karen Nicholson? '
“[Chief Bobo]: She was the apartment caretaker,- kind of on-site manager of this complex.
“[Prosecutor]: Before this event did you know Ms. Nicholson?
“[Chief Bobo]: Yes.
*775 “[Prosecutor]: As Chief of Police do y’all routinely patrol Warrior River Apartments?
“[Chief Bobo]: Yes.
“[Prosecutor]: And do y’all get familiar with the resident managers and them get familiar with you?
“[Chief Bobo]: Yes.
“[Prosecutor]: Do they frequently report things to you that’s going on at the apartments?
“[Chief Bobo]: Yes.
“[Prosecutor]: Had you ever received any reports on Michael Crumpton?
“[Chief Bobo]: No.
“[Prosecutor]: Now, back about six days before Michael’s death, State’s Exhibit 11, does it reflect a notation in those records that you’re the custodian of where Ms. Karen Nicholson reported as somebody trying to kick in the front door to Michael Crumpton’s home?
“[Chief Bobo]: Yes.
“[Prosecutor]: Does that document reveal what exactly was reported?
“[Chief Bobo]: Yes, it does.
“[Prosecutor]: And is that kept in the ordinary course of business like you testified earlier?
“[Chief Bobo]: Yes, it is. .
“[Prosecutor]: And that would be your dispatcher making entries as the information comes in simultaneously as it’s reported?
“[Chief Bobo]: That is correct.
“[Prosecutor]: Does it have a notation on there of an incident that happened that six days, as I said, before?
“[Chief Bobo]: Yes, sir.
“[Prosecutor]: What is on that notation?
“[Chief Bobo]: It’s actually October 6th, 2009. The code sign is APX, incoming call, 226 which is Cordova PD. The time is military time 056 and shows a 10-21 which was a phone call from Karen Nicholson at- Warrior River Apart- - ment number 305. Advised of several people running by her apartment- after she heard, a loud bang. Asking for an officer to check things, out. Also states the subjects left in a gold car unknown direction in travel. And it has the phone number she actually called . from. And then at military hours 102 Officer C8 was 10-23 at Warrior River Apartments. Then it says call sign C8 225. Advised that possible shots fired by two black males who left in a late 70’s model Monte Carlo, tan in color. Everyone 10-4 on the scene. Then it shows he went 10-8 at 118 military time.
“[Prosecutor]: Now, specifically on Ms. Nicholson’s part on there where it’s reported to y’all about the gold colored vehicle, do you note that on there?
“[Chief Bobo]: Yes.
“[Prosecutor]: That is the subjects •that ran by her window or sliding glass doors that had banged on Michael’s door, they left in a gold colored vehicle?
“[Chief Bobo]: Yes.”
(R. 1135-37.) Shanklin also contends that the circuit court erred when it allowed Chief Bobo to testify as follows:
“[Prosecutor]: Do you recognize, is that State’s Exhibit 75?
“[Chief Bobo]: State’s Exhibit 75. Yes, I do.
“[Prosecutor]: You recognize that?
“[Chief Bobo]: Yes.
“[Prosecutor]: What is it?
■ “[Chief Bobo]: This is my statement that I did after I completed transporting Mr. Shanklin.
“[Prosecutor]:' All right. More accurate is that -a report that you did in relation to exactly what happened made contemporaneously when • you arrived *776 back in Jasper showing the mileage, the time, even kept receipts of the McDonald’s package you got him, and exactly what was asked of you and what was told by Mr. Shanklin?
“[Chief Bobo]: Yes.
“[Prosecutor]: Is that the kind of report that you would keep in the normal course of business in your job?
“[Chief Bobo]: Yes.
“[Prosecutor]: Was it done contemporaneously, I mean by that being at the same time, or immediately thereafter when you got to Jasper?
“[Chief Bobo]: Yes.
“[Prosecutor]: If you would, I would like to ask you to read that report please, sir.
“[Chief Bobo]: Yes, sir. ‘On 10/17/09 at approximately 12:25 a.m. Kenneth Bobo and Deputy Ralph Williams arrived at Albertville Police Department to pick up Clayton Shanklin on felony warrants. While Bobo and Williams was walking Shanklin to the patrol car, Bobo told Shanklin he was under arrest for felony warrants and showed Shanklin the warrants. Shanklin said, “I just want to tell my side of the story and that girl did not have anything to do with it.” During the trip back Shanklin asked, “How did y’all find out where I was.” Bobo told Shanklin that he did not know, that Investigator John Softley was working the case and he knew. Shanklin said, “I bet it was my cell phone because I sent a text message.” Bobo said that Softley will know and Shanklin says, “Yeah, I know Softley because I even called him and told him that I was going to turn myself in.” Beginning mileage on the unit number was 112, was 18146. The time was 12:30. We stopped at McDonald’s. The mileage was 18152. The time was 12:37. We left McDonald’s drive-through same mileage at 12:47. We stopped at Cordo-va. Mileage was 18258. The time was 2:14 a.m. We left Cordova same mileage. Time was 2:14 a.m. Stopping at courthouse mileage was 18270. The time was 2:29 a.m. Then leaving the courthouse mileage 18270. The time was 2:41 a.m. Arriving at Walker County Jail mileage 18270. The time was 2:43 a.m.’ Then it has Chief Kenneth Bobo — my signature.
“[Prosecutor]: Would that be the details, minute details of everything that was said and done and mileage and the whole thing about what this man said and what you did relative to picking him up in Albertville and bringing him back here to Jasper, Alabama?
“[Chief Bobo]: Yes.”
(R. 1144-46.)
Assuming, without deciding, that the circuit court erred in allowing Chief Bobo to read those reports into the record, the admission of those reports was harmless beyond a reasonable doubt because those reports were cumulative to other lawfully admitted evidence. See Gobble v. State, 104 So.3d 920, 958 (Ala.Crim.App. 2010) (“Also, assuming that the statement was hearsay, its admission was harmless beyond a reasonable doubt.”); see also Belisle v. State, 11 So.3d 256, 299 (Ala.Crim. App.2007) (“Any error in the admission of hearsay testimony was harmless beyond a reasonable doubt when the testimony is cumulative to other lawfully admitted testimony.”).
With regard to Chief Bobo’s testimony about State’s Exhibit 71 — the Cordova Police Department Radio Log — Chief Bobo’s testimony detailing a telephone call placed by Karen Nicholson on October 6, 2012, to the Cordova Police Department was cumulative to Karen Nicholson’s trial testimony. Specifically, at trial Nicholson testified as follows:
*777 “[Prosecutor]: Okay. About six days prior to this, do you remember an incident occurring at their apartment?
“[Nicholson]: Yes, sir.
“[Prosecutor]: Tell us about that.
“[Nicholson]: Again, I was asleep on the couch, this time in the living room, and it was later at night. I don’t recall how late, maybe between 11:00 and 1:00, I’m not exactly sure. There was just a very, very loud bang on their door next to me and I woke up. And it was so loud that the building next to ours tenants came outside to see what it was. We thought maybe it was a gunshot or something then, it was just so loud. Actually, before I went out the door, two guys, I could hear two people, ran really fast past my apartment. I looked out and tried to see, but it was dark, I couldn’t see who it was. After they had a time to get away, I went outside to see what happened and other tenants were outside. And they said that they saw whoever the assailants were get into a gold car and leave.
“[Prosecutor]: Did you call and report that to the police department?
“[Nicholson]: I did. I called Cordova police and asked if they would come out and see, you know, if there was anything or try to catch the car actually is what I tried to call them and see if they can — if they’re anywhere in the vicinity they can maybe stop them.”
(R. 894-95.)
Additionally, with regard to Chief Bobo’s testimony about State’s Exhibit 75 — Chief Bobo’s report detailing statements Shanklin made in Albertville, that testimony is cumulative to Chief Bobo’s earlier trial testimony. Specifically, Chief Bobo, without reading State’s Exhibit 75, testified as follows:
“He told me after I advised him he was under arrest and I showed him the arrest warrants I had on him, we were in the sally port of the Albertville Police Department and Mr. Antwain Shanklin, he advised me that he didn’t have nothing to do with this. I’m sorry, correction. He advised me the girl didn’t have nothing to do with this. And he just wanted to tell his side of the story. He also asked on another occasion how did we find him, and I told him that he would have to talk to Mr. Softley, that he knew all of that information. He furthermore said that he. bet it was the cell phone because he had sent us a text message. And I again told him that he would have to talk to Mr. Softley about that. I asked him if he knew Mr. Soft-ley and he says, Yes, I know Mr. Soft-ley,’ that [he] actually called him on his cell phone.”
(R. 1143.)
Because the testimony regarding State’s Exhibit 71 and State’s Exhibit 75 was cumulative to both Nicholson’s trial testimony and to Chief Bobo’s trial testimony— which were both lawfully admitted, the circuit court’s error in allowing this testimony, if any, was harmless.
C.
Shanklin contends that the circuit court “reversibly erred in allowing admission of phone records.” (Shanklin’s brief, p. 31.) Specifically, Shanklin, in his brief on appeal, argues, in total:
“Prior to trial, the defense moved in limine to preclude the introduction of certain phone records. (R. 60-62.) The defense objections included: 1) the records were not Clayton Shanklin’s records 2) the records themselves were unnecessarily confusing, and 3) the records were inadmissible hearsay. (R. 60.) The trial court denied the motion. (R. 62.) The objection was renewed twice *778 and overruled both times. (R. 762, 883-84.) The records were introduced as business records utilizing the hearsay exception. (R. 881-83.)
“At trial the State called Scott Autry, an employee with AT & T. (R. 880.) Mr. Autry testified about call details and text messages from (205) 275-4711 from October 10, 2009 through October 17, '2009. (R. 881.) The account was for a pre-paid phone and -showed up as a hybrid customer with Dallas, Texas and Jasper, Alabama addresses. Because it was never shown who actually owned or operated this phone; these records ■ should have 'been suppressed.”' .
(Shanklin’s brief, pp. 31-32.)
Initially, we note that Shank-lin’s two-paragraph argument in his brief on appeal fails to satisfy Rule 28(a)(10), Ala. R.App. P., because he cites no authority to support his claim. Shanklin, instead, makes only a bare allegation that the circuit court .“reversibly erred in allowing, admission of phone records.”[25] (Shank-lin’s brief, p, 31.) .
Regardless, Shanklin is not entitled to relief on his claim that the circuit court erred when it admitted the cellular-telephone records. Although it is not clear, it appears that Shanklin contends that the circuit court erred when it admitted State’s Exhibit 18 — the cellular-telephone records from AT & T for telephone number 205-275-4711. Shanklin raises three arguments with regard to State’s Exhibit 18.
Shanklin first contends that, the circuit. court erred when it admitted State’s Exhibit 18 because, he says, “the records were not Clayton Shanklin’s records.” (Shanklin’s brief, p. 31.) Although Shanklin correctly argues that State’s Exhibit 18 does not specifically identify Shanklin as the “subscriber” of that cellular telephone and, instead, identifies the “subscriber” as a “hybrid customer,” State’s Exhibit 18 clearly establishes that the cellular-telephone records were for a cellular telephone with the number 205-275t4711. The evidence presented at trial indicated that Shanklin contacted Tracy Ward using a cellular telephone with the number 205-275-4711. Thus, the evidence presented at trial indicated that the records were, in fact, Shanklin’s.
Shanklin also contends that “the records themselves were unnecessarily confusing.” (Shanklin’s brief, p. 31.) At trial, Shanklin objected to State’s .Exhibit 18 under Rule 403, Ala. R. Evid., because, he said, of “the ... confusing nature of the records.” (R. 882.) Although Shanklin argues that State’s Exhibit 18 is “confusing,” that exhibit consists of a spreadsheet of approximately 50 pages that clearly details call date and time, the telephone number being called, the telephone number being called from, and the duration of the call. Contrary to Shanklin’s assertion, State’s Exhibit 18- is not “confusing.” Even if we were to construe it as “confusing,” however, the probative value of State’s Exhibit 18 — i.e., evidence of Shanklin’s telephone calls or text messages made at specific times to specific telephone .numbers — is not substantially outweighed by . any possible confusion.
Finally, Shanklin contends that the records were inadmissible hearsay. At trial, .although Shanklin objected to the admission of State’s Exhibit 18, Shanklin did not argue that the exhibit was inadmissible *779 hearsay;[26] rather, Shanklin argued that the State failed to lay the proper foundation for the admission of the exhibit. Specifically, Shanklin argued that the State’s
“witness[, Scott Autry,] hasn’t' exhibited that he knows how the — the course in which those records are kept, and foundational issues such as that, like how they’re kept in the ordinary ¡course of business, what procedures ar§ used in the ordinary course of business of the business records.”
(R. 883.) Thus, to the extent that Shank-lin argues that the telephone records, are inadmissible hearsay,-we review that claim for plain error.
Here, State’s Exhibit 18, even if hearsay, is admissible as an exception to the hearsay rule — specifically, as a record of regularly conducted activity under Rule 803(6), Ala. R. Evid., which states:
“A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice'of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12),'or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term ‘business’ as used in this paragraph includes business, institution, association; profession, occupation, and calling of every . kind, whether or not conducted for profit.”
- This'Gourt has explained that,
“ ‘if one offers a document under Rule 803(6) then the proper method of authentication, as well as satisfying the elements of showing it to be a business record, is through the testimony of a shepherding witness. There is not a requirement that such a shepherding witness have firsthand knowl- edge of the matters recorded. Indeed, •.the witness may not have even been associated with the business at the time that the record was made. However, the witness must be either the custodian or one who knows whether it was the regular practice of the business to make such a record and whether the record was kept in the course of regularly conducted business.’
‘“Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 264.01(3) at 1540 (6th ed.2009).”
Pettibone v. State, 91 So.3d 94, 112 (Ala. Crim.App.2011).
At trial, the State called Scott Autry, a security manager for AT & T, who testified that one of his jobs is a custodian of records for AT & T and that State’s Exhibit 18 is “call detail and text message records for telephone number 205-275-4711. Looks like for the time period of— some calls as early, as October 10, 2009, through calls on October 17, 2009.” (R. *780 881.) Additionally, Autry testified that the cellular-telephone records at issue are kept in the course of a regularly conducted business activity.
Thus, the State met the requirements of admissibility under Rule 803(6), Ala. R. Evid., for the cellular-telephone records.
Accordingly, the circuit court did not err when it admitted the cellular-telephone phone records over Shanklin’s objection.
VIII.
Shanklin contends that the circuit court erred when it failed to suppress “certain statements at trial.”[27] (Shanklin’s brief, p. 70.) The totality of Shanklin’s argument on appeal is as follows:
“While the use of confessions through jailhouse snitches is allowed in Alabama, their 'use is inherently unreliable and should not be allowed. The trial court, over [Shanklin’s] objection and motions in limine, allowed statements supposedly made by [Shanklin] to be introduced through Tyrone Dickerson, Isaiah Howze, and Jarrell Thomas. (R. 46, 61.) These statements were irrelevant, unduly prejudicial, and hearsay and therefore should have been excluded.
“The statements of Tyrone Dickerson, Isaiah Howze, and Jarrell Thomas should have been suppressed. Reversal is required because allowing these statements deprived [Shanklin] his right to a fair trial under the Sixth and Fourteenth Amendments to the United States Constitution.”
(Shanklin’s brief, pp. 70-71.)
Initially, we note that Shankliris two-paragraph argument fails to satisfy Rule 28(a)(10), Ala. R.App. P., because Shanklin, in making this argument, cites no authority to support his claim. Shanklin, instead, makes only a bare allegation that “the use of confessions through jailhouse snitches ... is inherently unreliable and should not be allowed.”
Regardless, Shanklin is not entitled to relief on his claim. Shanklin contends that these “statements were irrelevant, unduly prejudicial, and hearsay.” These statements, however, were relevant to show Shanklin’s culpability for killing Michael, see Rule 401, Ala. R. Evid. (“ ‘Relevant evidence’ means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”); the statements were not unduly prejudicial because the probative value of the statements was not “substantially outweighed” by any prejudice, see Rule 403, Ala. R. Evid. (“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”); and the statements were not hearsay, see Rule 801(d)(2), Ala. R. Evid. (“A statement is not hearsay if.... [t]he statement is offered against a party and is ... the party’s own statement in either an individual or a representative capacity.”). Consequently, the circuit court did not err when it did not “suppress” the statements of Tyrone Dickerson, Isaiah Howze, and Jar-rell Thomas.
IX.
Shanklin contends that the circuit court erred “by allowing the State to introduce prejudicial victim-impact evidence during” the guilt phase of his trial.[28] (Shanklin’s *781 brief, p. 50.) Specifically, Shanklin asserts that, during the guilt-phase proceedings, the circuit court “permitted the' State to introduce testimony about the effect of Michael Crumpton’s deaths [Sic] on the surviving members of the family” — namely, Ashley and Lori, (Shanklin’s brief, p. 51.) According to Shanklin,
“Ashley Crumpton testified about her and [Michael’s] relationship, 'how they met and how long they dated. (R. 572-73.) She talked at length about their lives together and about her children with the victim. (R. 572-78.) The State also elicited testimony about the victim’s funeral. (R. 579-81.) The victim’s mother, Lori [Crumpton], also testified about irrelevant matters meant to elicit sympathy from the jury. (R. 667-70.) She also testified’about and the State published photos of the victim’s children during Christmas and in their Halloween costumes. (R. 672-73.)”
(Shanklin’s brief, pp. 51-52.)
Initially, we note that Shanklin did not object to the complained-of testimony of Ashley and Lori; therefore, we review this claim under the plain-error rule.
“.‘It is well settled that victim-impact statements “are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible.” Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993), citing Charles W. Gamble, McElroy’s Alabama Evidence, § 21.01 (4th ed.1991). However, “when, after considering the record as a whole, the reviewing court is convinced that the jury’s verdict was based on the overwhelming evidence of guilt and' was ■ not based on'any prejudice that might have been engendered by the improper victim-impact testimony, the admission of such testimony is harmless error.” Crymes, 630 So.2d at 126.’
“Jackson v. State, 791 So.2d 979, 1011 (Ala.Crim.App.2000).”
Gissendanner v. State, 949 So.2d 956, 965 (Ala.Crim.App.2006); “[T]he introduction óf victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record’indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based' on the admissible evidence and the applicable law'.” Ex parte Rieber, 663 So.2d 999, 1006 (Ala.1995). However, “a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim' impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.” Id. at 1005.
Shanklin’s claim that Ashley’s and Lori’s testimony about Michael’s funeral was .improper victim-impact testimony is without . merit. As explained above, Shanklin was indicted for two counts of capital murder and one count of attempted murder. To prove capital murder the State was required to prove that Michael was, in fact, deceased — that element is met by Ashley’s and Lori’s testimony that they attended Michael’s funeral.[29] Consequently, Lori’s and Ashley’s testimony about attending Michael’s funeral was admissible during the guilt phase of Shanklin’s trial because it was “relevant to a material issue of the guilt phase.”
*782 Shanklin, however, correctly argues that.Ashley’s testimony about her and Michael’s relationship, how they met, how long they dated, and their children was not “relevant to a material issue of the guilt phase.” Likewise, Lori’s testimony about how long she had known Ashley, how Ashley and Michael met, when Ashley and Michael got married, and the fact that Ashley and Michael lived with her until their first daughter was born was not “relevant to a material issue of the guilt phase.” Consequently, that testimony was inadmissible. . . •
Regardless, after examining the record as a whole, we cannot conclude that their testimony “probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law,” Ex parte Rieber, 663 So.2d at 1006; rather, the record “conclusively shows that the admission of the victim impact evidence during the guilt phase of the. trial did not affect the outcome of the trial or otherwise prejudice a substantial right "of tile defendant.” Id. at 1005.
Here, Lori’s and Ashley’s testimony, although inadmissible, was brief background information that did not specifically focus on the effect that Michael’s death had on them. When- comparing that brief testimony to the overwhelming evidence of Shanklin’s participation in this offense we cannot conclude that the admission of that testimony “prejudiced a-substantial right of [Shanklin].” Ex parte Rieber, 663 So.2d at 1005. ■■
“It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [Shanklin] did not receive, a fair trial simply because the jurors were told what they probably had already suspected — that. [Michael] was not a ‘human island,’ but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter’s opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991)).”
Ex parte Rieber, 663 So.2d at 1006. Accordingly, Shanklin is, not entitled to relief on this claim.
X.
Shanklin contends that, “during the State’s examination of [Ashley,] [the] District Attorney .,. improperly showed the photo lineup to the jury before requesting publication.”[30] (Shanklin’s brief, pp, 24-25.) The totality of Shanklin’s argument on appeal is as follows:
“During the State’s examination of Ashley Crumpton, [the] District Attorney improperly showed: the photo lineup to the jury before requesting publication. (C. 94.) The mug shot shown to the jury at this time contained information that the jury should, have never seen or knew about; Clayton Shanklin’s ' [Alabama Institutional Serial] number, where he was incarcerated, and the crimes with which he had been charged. As the District Attorney was walking this picture past the jury, he requested that the photo be published. - This request was denied. Id. Even though the request to publish was denied, the harm .. was already done. The jury had already seen the ‘mug shot’ and other impermissible information about Mr. Shanklin. Therefore, because the District Attorney showed the jury a prejudicial photo line *783 up that was never admitted into evidence in that form, Mr. Shanklin was denied his right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.”
(Shanklin’s brief, pp. 24-25 (footnote omitted).)
Shanklin’s one-paragraph argument in his brief on appeal, fails to satisfy Rule 28(a)(10), Ala. R.App. P., which requires that an argument contain “the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on.” (Emphasis added.) Shanklin cites no authority to support this argument. Instead, Shanklin makes only a bare allegation that the district attorney “improperly showed the photo lineup to the jury before requesting publication.”
Regardless, Shanklin is not entitled to relief on this claim. Shanklin, in his motion for a new trial, raised the precise argument he now raises on appeal. Although the circuit court conducted a hearing on. Shanklin’s motion for a new trial, Shanklin presented no testimony during that hearing. Shanklin’s counsel, instead, merely argued to the circuit court the claims he raised in the motion for a new trial.
This Court has held:
“There is no error in a trial court’s denial of a motion for new trial where no evidence is offered in support of that motion. Tucker v. State, 454 So.2d 541, 547-48 (Ala.Cr.App.1983), reversed on other grounds, 454 So.2d 552 (Ala.1984); McKinnis v. State, 392 So.2d 1266, 1269 (Ala.Cr.App.1980), cert. denied, 392 So.2d 1270 (Ala.1981). The motion itself was unverified and was not accompanied by any supporting affidavits. Consequently, the assertions of -counsel contained therein ‘are bare allegations and cannot be considered as evidence or proof of the facts alleged’ Thompson v. State, 444 So.2d 899, 902 (Ala.Cr.App. 1984) (quoting Daniels v. State, 416 So.2d 760, 762 (Ala.Cr.App.1982)); Smith v. State, 364 So.2d 1, 14 (Ala.Cr. App.1978). Similarly, statements made by counsel during a hearing .on a motion for new trial cannot be -considered , ..evidence in support of the motion-. Vance v. City of Hoover, 565 So.2d 1251, 1254 (Ala.CrApp.1990).”
Arnold v. State, 601 So.2d 145, 154-55 (Ala.Crim.App.1992) (emphasis added).
Although Shanklin’s counsel argued during- the hearing on the motion for a new trial that the district attorney improperly showed the jury the photo lineup before requesting publication, Shanklin’s counsel did not offer any testimony proving that allegation. Thus, the only statements the circuit court was left to consider regarding the claim-asserted*by Shanklin in his motion for a new trial were assertions by his counsel. -Because counsel’s arguments in Shanklin’s motion for a new trial and at the,evidentiary hearing are not evidence, the circuit court had no evidence to consider ip support of the claim raised in the motion for a new trial
Additionally, the circuit court in its order denying-Shanklin’s motion for. a new trial concluded that the State “never showed the photo-array to the jury prior to this court’s permission.” ■ (C. 99.) Nothing in the record on appeal — other than the assertion by Shanklin’s counsel— undermines the circuit court’s finding.
Accordingly, Shanklin is not entitled to relief on this claim.
XI.
Shanklin contends that the circuit court erred when it “allowed the State to imply *784 that [Shanklin] had a prior criminal history.” [31] (Shanklin’s brief, p. 55.) Shanklin, in his brief on appeal, addresses four specific instances where he contends that the State implied that he had a criminal history. We ■ address each instance in turn.
As a threshold issue, however, we note that Shanklin failed to object to some of complained-of instances in the circuit court; thus, we examine those claims for plain error. See Rule 45A, Ala. R.App. P. We note the particular instances not objected to as we address them.
Additionally, we note that Shank-lin’s argument is grounded in belief that the implications made by the State in these four specific instances injected evidence of Shanklin’s “prior bad acts” into the guilt-phase of his trial. The Alabama Supreme Court has explained that “the exclusionary rute prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.” Ex parte Drinkard, 777 So.2d 295, 302 (Ala.2000) (citing Ex parte Cofer, 440 So.2d 1121, 1123 (Ala. 1983)).
The first two instances Shanklin contends were improper occurred during Chief Bobo’s trial' testimony. Specifically, Shanklin argues that the State implied that Shanklin had a criminal history when, on direct examination of Chief Bobo, it “asked Chief Bobo if law enforcement included ‘people that had a background in doing some situations like this that had been involved in some activities similar to a violent home invasion situation’ ” when creating the photo lineup, ,and also implied that Shanklin had a criminal history when the State referred to the photographs used in the photo lineup as “mug shots” or “mug books.” (Shanklin’s brief, - p. 55.) Shanklin did not object to either of these complained-of instances; thus, our review is limited to plain error.
At trial, the State called Chief Bobo to testify. During his testimony, the State asked Chief Bobo about State’s Exhibit 1 — the photographic lineup, and the following exchange occurred:
“[Chief Bobo]: These are LETS printouts from my system. All these pictures are from LETS except for one photograph. Another one of the LETS printouts is from Investigator Keith Cohcord who was in my office at the ’ time.
“[Prosecutor]: Is it your testimony, Chief Bobo, that at the direction of Mr. Cote that he requested that you put together like a mug book to show witnesses; is that correct?
“[Chief Bobo]: That is correct.
“[Prosecutor]: And, when you did your search to just get some photographs, did you have some parameters for your search?
“[Chief Bobo]: Yes.
“[Prosecutor]: And did that include a general height and weight that y’all had earlier gotten from Ms. Ashley Crump-ton? '
“[Chief Bobo]: Yes.
“[Prosecutor]: Did it also include a racial makeup that you got from Ashley Crumpton?
“[Chief Bobo]: Yes.
“[Prosecutor]: Did you also include areas of the county within the parameters of your search of Parrish-Cordova area?
“[Chief Bobo]: Yes.
“[Prosecutor]: Also did you include in that, people that had a background *785 maybe in doing some situations like this that had been involved in some activities similar to a violent home invasion situation?
“[Chief Bobo]: Yes.
“[Prosecutor]: All right. When you put all of those together, there are approximately thirty photographs in there?
“[Chief Bobo]: Yes.”
(R. 1162-63.) Although Shanklin correctly notes that the State asked Chief Bobo if, when preparing the photo lineup, he included “people that had a background maybe in doing some situations like this that had been involved in some activities similar to a violent home invasion situation” (R. 1163), that question did not demonstrate that Shanklin was, in fact, one of the 29 people who were included in the photo lineup that had previously committed a “violent home invasion.”
Additionally, Shanklin correctly asserts that the State referred to the photographs used in the photo' lineup as “mug shots.” (R. 1161, 1162, 1165, 1167.) Although this Court has not held that it is improper to refer to photographs used in a photo lineup as “mug shots,” this Court “has recognized the danger inherent in the use at trial of ‘mug shot’ ... photographs.” Carlisle v. State, 371 So.2d 975, 978 (Ala. Crim.App.1979) (citing Holsclaw v. State, 364 So.2d 378 (Ala.Crim.App.1978)); see also McNabb v. State, 887 So.2d 929, 972-73 (Ala.Crim.App.2001). The danger of admitting such photographs is in the inference created by their use—that the defendant has a prior criminal history. Carlisle v. State, 371 So.2d at 978. “Mug shot”type photographs, however, are admissible “[i]f numbers, dates, and the names of police departments are excised or blocked out ... so long as they do not imply that the defendant has a prior criminal record.” Carlisle v. State, 371 So.2d at 978.
Here, even if the State’s reference to the photographs used in the photo lineup as “mug shots” was improper, it does not rise to the level of plain error. At trial, although the State, when questioning Chief Bobo, generally referred to the photographs used in the lineup as “mug shots,” Chief Bobo testified that the lineup was generated by using the LETS system, which, he said, included “driver’s license photos, Department of Correction photos, any background information whatsoever.” (R. 1161.) Additionally, there was no specific reference to Shanklin’s photograph as, in fact, being a “mug shot”—as opposed to simply a driver’s license photo.[32] Furthermore, when published to the jury, the photographs used in the photo lineup had been excised of all criminal history, driving history, “numbers, dates,' and the names' of police departments”; thus, we find no plain error.
Shanklin next contends that the State implied that he had a criminal history when “Investigator Softley ... testified that , he knew [Shanklin] from the community.” (Shanklin’s brief, p, 55.)
At trial, Investigator Softley testified as follows:.
“[Prosecutor]: Okay. And what community do you live in? '
“[Investigator Softley]: Parrish community.
“[Prosecutor]: And how long have you lived down there?
*786 “[Investigator Softley]: Most of my life, forty years, fifty years, basically.
“[Prosecutor]: Okay. Do you know Antwain Shanklin?
“[Investigator Softley]: I do.
“[Prosecutor]: And. do you know him . from your community?
“[Investigator Softley]: I do.
“[Prosecutor]: Okay. How long have you known Antwain?
“[Investigator Softley]: ' Probably most of his life. I’ve known him a long time, fifteen years maybé, something like that.”
(R. 1507-08.) Although Shanklin argues that Investigator Softley’s testimony implied that he knew Shanklin “in his law enforcement'capacity,”' Investigator Soft-ley’s testimony clearly established that he knew Shanklin from living in the Parrish community — not in his law-enforcement capacity. Thus, we find ho plain error.
Finally, Shanklin contends that the State implied that he had a criminal history when “the State elicited testimony from Joshua Moreland about [Shanklin’s] having a ‘pretty good rap around the jail about him on the street being violent.’” (Shanklin’s brief, pp. 65-56.)
At trial, Moreland testified, in part, as follows:
“[Prosecutor]: Okay. You had been with Antwain enough to get an idea how he acted and what he was like when he was down there in jail. Did you believe him when he told you this?
“[Moreland]: Yeah.
“[Prosecutor]: Did he sound pretty serious?
“[Moreland]: Yeah, you hear a lot about him in jail from some of the other people that know him on the street. He’s kind of curious, but he’s a smaller guy, you know, he’s got a pretty good rap around, the jail about him. on the street being violent.
“[Shanklin’s trial counsel]: I would object and move to strike. He’s testifying to hearsay now.
“THE COURT: I’m going to sustain that objection. Motion to strike is granted.”
(R. 854.)
Initially, we recognize that Shanklin objected to Moreland’s statement, and Shanklin’s objection was sustained and the testimony was stricken from the record. Thus, “there is no adverse ruling from which [Shanklin] can appeal, [and] we ... review this claim pursuant to the plain error rule.” Melson v. State, 775 So.2d 857, 873 (Ala.Crim.App.1999).
Even assuming Moreland’s statement was improper, we cannot conclude that the statement resulted in error that adversely affected .the substantial rights ■Shanklin. Although Moreland testified that Shanklin had “a pretty good rap around the -jail about him on the street being violent,” throughout Shanklin’s trial the State presented lawfully admitted evidence demonstrating Shanklin’s violent behavior.- Specifically, at the time he made the complained-of statement, More-land had already testified that Shanklin had confessed to him that Shanklin “shot the guy,” that “he shot [Ashley],” and that he had said that “he wished he would have killed Kevin” to eliminate a witness. Additionally, the jury heard testimony from Amber Piper that Shanklin threatened to kill her and her child.if she told anyone about Shanklin’s involvement in the crime. Because there was other lawfully admitted evidence of Shanklin’s violent behavior outside jail, we ■ cannot conclude that Moreland’s testimony that Shanklin had a reputation for violent behavior was plain error.
*787 XII.
Shanklin contends that the prosecutor “engaged in repeated misconduct by improperly communicating to the jury that the State felt that the death penalty was the appropriate punishment in this case, improperly vouching for the State’s witnesses, and by identifying himself as the victims’ representative.”[33] (Shanklin’s brief, p. 58.) Shanklin did not object to the prosecutor’s comments in the circuit court; thus, we review Shanklin’s arguments on appeal for plain error.
“ ‘While the failure to object will not bar our review of [Shanklin’s] claims of prosecutorial misconduct, it will weigh against any claim of prejudice that [Shanklin] makes on appeal “ ‘ “because of its suggestion that the defense did not consider the comments in question to be particularly harmful.”’” Ferguson v. State, 814 So.2d 925, 945 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala. Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).’
“Calhoun v. State, 932 So.2d 923, 962 (Ala.Crim.App.2005).
“Also, many of the instances involve challenges to arguments made by the prosecutor in his opening or closing statements.
“ ‘ “In reviewing allegedly improper prosecutorial argument, we must first determine if the argument was, in fact, improper. If we determine that the argument was improper, the test for review is not whether the comments influenced the jury, but whether they might have influenced the jury in arriving at its verdict.” Smith v. State, 698 So.2d 189, 202-03 (Ala.Cr. App.1996), aff'd, 698 So.2d 219 (Ala. 1997), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997) (citations omitted); Bush v. State, 695 So.2d 70, 131(Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.1997), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997) (citations omitted). “The relevant question is whether the .prosecutor’s comments ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’” Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Comments made by the prosecutor must be evaluated in the context of the whole trial. Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App. 1990), aff'd, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992). “Prose-cutorial misconduct is subject to a harmless error analysis.” Bush v. State, 695 So.2d at 131 (citations omitted); Smith v. State, 698 So.2d at 203 (citations omitted).’
“Simmons v. State, 797 So.2d 1134, 1161-62 (Ala.Crim.App.1999) (opinion on return to remand). We must view the challenged arguments in the context of the entire trial and not in the abstract. See Duren v. State, 590 So.2d 360 (Ala. Crim.App.1990); Whitlow v. State, 509 So.2d 252 (Ala.Crim.App.1987). It is proper for a prosecutor to argue any legitimate inference that may be drawn from the evidence. See Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003).”
Belisle v. State, 11 So.3d 256, 302-03 (Ala. Crim.App.2007). We address each alleged instance of misconduct in turn.
*788 A.
Shanklin contends that the prosecutor “placed improper emphasis on the appropriateness of the death penalty” by suggesting that “Shankhn’s case was the most important case in the county and then implying] that the Walker County District Attorney’s Office doesn’t like to try capital cases, saying that it was not easy for him, and that he only did so when they had to.” (Shanklin’s brief, p. 59.) ■ Additionally, Shanklin contends that he prosecutor improperly commented on the importance of Shanklin’s case in his opening statement and on the seriousness of Shanklin’s case in his closing argument. Shanklin also contends that the prosecutor engaged in misconduct when he “referred to the thousands of cases he had in his office at the moment.” (Shanklin’s brief, p. 59.)
Shanklin contends that during voir dire the prosecutor improperly commented on his expertise by referencing the “thousands of cases” he handles. That claim, however, is without merit.
During voir dire, the prosecutor told the venire that he expected the evidence to establish that this case was “going to be somewhat related to drugs” (R. 216), and asked the venire if anyone felt “so strongly about drugs and those issues that you think it might make it difficult to serve on a jury.” (R. 216.) After a prospective juror responded to the prosecutor’s question by stating that he knew three individuals who had died because of drug use, the prosecutor responded as follows:
“Thank you for sharing that and I hate your loss. You know, as [district attorney] I have to deal with it all the time. There are thousands of cases we have right now on drug,cases. But does everybody understand that, you know, drugs affects, of course, the people that use them, but there’s also a big underbelly of drugs out there with folks that sell and folks that steal and crime that occurs because of it.
“Is there anybody that disagrees with that idea that I’m talking about that drugs affects the people using, of course, but there’s also a big problem with the things that stem from drugs, such as, crime and violence and theft and things like that. Is there anybody that disagrees with that?”
(R. 220.) Although Shanklin argues that the prosecutor’s reference to “thousands of cases” was an improper comment on his “expertise” (Shanklin’s brief, p. 60), the prosecutor’s comment, when viewed in context, is merely an attempt to both express sympathy to a prospective juror and to express to the venire that he realizes that many people are affected by drug use and that he understands that people may have strong feelings about a case that involves drugs. Thus, there is no plain error as to this claim.
Shanklin also contends that the prosecutor, on three different occasions, improperly “stressed the status of this case saying it was ‘important.’ ” (Shank-lin’s brief, p. 59.) Specifically, Shanklin cites to two portions of voir dire where the prosecutor used the word “important” when speaking to the venire. Shanklin, however, cites to no authority standing for the proposition that a prosecutor’s comment that a case is “important” is error. See Rule 28(a)(10), Ala. R.App. P. Regardless, Shanklin’s claim is without merit.
At the beginning of the State’s voir dire examination, the prosecutor made the following comment:
“First of all, I want to tell you I appreciate you being here again, just like the Judge, on your duty and your service, it’s real important to everybody. It’s important to this young man right here. It’s also- important to Michael’s *789 family as well. So, on- their behalf I want to say thank you.”
(R. 194.) Additionally, as the prosecutor ended his voir dire he stated:
“I know this is very trying on everybody. It’s trying on the defendant. It’s trying on the family. And I hate that we’ve had to take /all out of your lives, but I hope everybody understands how important this all is. A little levity never hurts anything in a situation like this. But we appreciate you being very attentive on Ms. Crumpton’s behalf and Ashley’s behalf, she’s going to be outside because she’s a witness, we appreciate that and thank you for that. And I think the defense may have a few questions. Thank you.”
(R. 244-45.) Finally, at the beginning of his opening statement, the prosecutor stated:
“If it please the Court. Good morning, /all. I appreciate /all’s indulgence over the last couple of days with all the prying we’ve done into your lives, but this is a very important matter. It’s very important to the defendant and it’s very important to Michael Crumpton’s family. And that’s why we have to do this.”
(R. 539.)
When viewing these statements in context, although commenting on the importance of this case, the prosecutor highlighted that the case was equally important to both Michael and to Shank-lin; thus, we find no error.
Shanklin also contends that a portion of the prosecutor’s rebuttal closing argument was improper. Specifically, Shanklin argues that the prosecutor stated that
“Shanklin’s case was the most important in the county and then implied that the Walker County District Attome/s Of- • fice doesn’t like to try capital cases, saying that it was not easy for' him, and that he only did so when they had to. '[The prosecutor] also implied that he only goes after the worst of the worst by stating that he doesn’t ‘use [the death penalty] all the time.’ ”
(Shanklin’s brief, p. 59 (citations omitted).)
During his rebuttal closing argument, the prosecutor argued:
“Folks, [Shanklin] cannot be the prosecutor, the judge and then the jury and then the executioner. That’s what being a juror and knowing your duty and knowing and listening to that evidence is 'all about. It’s not easy.
“I’ve had the situation come up four times' in my career as a prosecutor to be right like I am' now and I’m going to be asking /all in a few minutes to come back with a guilty verdict, capital verdict and later come back and ask- you to recommend to the Judge the death penalty. I’ve had to do that four times in my career. It’s not easy for me to do that. I don’t take it lightly. I don’t use it all the time when I’m trying to go after folks as a [district attorney]. But I want you to think about the risk involved with people coming into this courtroom and what the/ve had to go through.”
(R. 1618-19.)
A prosecutor’s comment about the number of times he or she has sought the death penalty is improper if it may be construed to be “similar to a prosecutorial argument at trial to the effect that ‘we only prosecute the guilty.’” Brooks v. Kemp, 762 F.2d 1383, 1410 (11th Cir.1985), judgment vacated by Kemp v. Brooks, 478 U.S. 1016, 106 S.Ct. 3325, 92 L.Ed.2d 732 (1986), reinstated on return to remand by Brooks v. Kemp, 809 F.2d 700 (11th Cir. 1987). Viewing the above-quoted com- *790 merits in context, we cannot conclude -that those comments conveyed the argument that the prosecutor “only prosecutes the guilty,” especially when the above-quoted comments reference the-.jury’s “duty.” Thus, we cannot conclude that 'those comments rise to the level of plain error.
Shanklin also contends that the prosecutor improperly commented on the seriousness of this case “compared to other cases he had tried in the past.” Shanklin specifically cites as an example a portion of the trial transcript at page 1756, on which page the following occurred:
“[Shanklin’s trial counsel]: And you understand — how do you feel about your son?
“[Shankliris father]: I love him with all my heart. If I could trade places with him, Í would..
“[Shankliris trial counsel]: And you understand the seriousness of what’s oc- . eurred with your son, don’t you?
“[Shankliris father]: Yes, sir.
“[Shankliris trial counsel]: But that hasn’t changed your feelings for him?
“[Shankliris father]: No, sir.
“[Shankliris trial counsel]: And what you’re asking the Court to do today?
“[Shankliris father]: I’m begging the Court to spare his life.
“[Shankliris trial counsel]: That’s all. Your Honor.
“[The Court]: Any—
“[Shankliris father]: And I would also like to say I’m sorry for the defendant [sic] family.
“[Shankliris trial counsel]: Just a minute, [Shankliris father]. They may have some questions.
“[The Court]: Does the State have any questions?
- “[Prosecutor]: We don’t have any questions.
“[The Court]: Thank you, sir. You may step down.”
(R. 1756 (emphasis added).) Thus, although Shanklin contends that the prosecutor improperly commented on the seriousness o.f this case, ft was Shankliris trial counsel — not the prosecutor — who commented on the seriousness of this case. Consequently, there is no error, much less plain error. .
B.
Shanklin contends that the prosecutor engaged in misconduct because, he says, the prosecutor in his rebuttal closing argument
“stated that he would show; the jury why he believes his witnesses ‘are telling the truth.’ (R. 1617.) He went on at great length to talk about the dangers the witnesses faced in testifying against Mr. Shanklin, even going so far as' to imply that Amber Piper’s child'may face retaliation for her testimony against Mr. Shanklin. (1616-17.)”
(Shankliris brief, p. 61.) Although Shank-lin correctly argues that it is improper for a prosecutor to vouch for the credibility of a witness, see Johnson v. State, 120 So.3d 1130, 1170 (Ala.Crim.App.2009), the prosecutor’s comments, when viewed in context, do not amount to vouching for the credibility of a witness.
Here, Shanklin takes issue with the following argument:
“I submit to you that you need to take into consideration as jurors the kind of risks some people have in coming into this courtroom and testifying against . somebody like this. What kind of risk . does it take for this man’s cousin to come into this courtroom and have to say that he hit them up to go hit a lick?
“You saw it, you judge the credibility, you judge how it took me having to get up here and force the man to look- at his *791 statement to say, Yeah, he asked me to go hit a lick. Yeah, I, yeah, robbery, yeah.’ Finally. They didn’t want to say that. What do you think those .two guys are going to live through? What do you think Isaiah Howze and Tyrone Dickerson are going to live through for saying what they said in here? What do you think Mr. Traywick is going to live with down at Bloody Bibb? How much do you think Ms. Piper, whose got a,child has got to worry about looking over her shoulder?
“I submit to you there’s a lot of price that has been paid to bring these witnesses in here and it’s not money. It’s not the [district attorney] trying to get or the investigators trying to get professionals over in Birmingham to' lie about something. It’s not anything like that. The price to pay is risk, with risk, to come into this courtroom and tell you stuff.
“I’m going to ask you to listen to what they said. That’s what I’m going to ask you to do, to listen to what they said. And I’m going to show you in a minute why I think they’re telling the truth about every dang bit of this,; But the other thing that I’m going to ask you to do is I’m going to. ask you to consider the risk that each one of these people are putting up with.”
(R. 1616-17.).
Here, the prosecutor’s above-quoted argument did not rise to the level of giving personal assurance that the State’s witnesses were, in fact, telling the truth, see, e.g., Ex parte Parker, 610 So.2d 1181, 1182 (Ala.1992) (holding -that a prosecutor’s comment in closing argument that, “I can assure you he told you the truth,” was improper); instead, the prosecutor correctly told the jury that it had to judge the credibility of the witnesses and, thereafter, argued why, based on the evidence at trial, those witnesses told the truth. Additionally, although the prosecutor stated that he was “going to show [the jury] in a minute why I think they’re telling the truth about every dang bit of this,”, this Court has held that “qualifying statements, such as T think’ as used in the present case, may result in a comment falling outside the prohibition against personally vouching for the witness.” Johnson v. State, 120 So.3d 1130, 1170 (Ala.Crim.App.2009). Moreover, even if the prosecutor’s arguments were improper, they would not rise to the level of plain error. See Ex parte Parker, 610 So.2d at 1184.
C.
Shanklin contends that the “prosecutor improperly informed the jury that the State represented the victims.” (Shanklin’s brief, p. 62.). Specifically, Shanklin argues that
“[a]t several points, the prosecutor referred to himself as the victims’ representative, telling the jury, that he swore an oath to the state ‘and for the victims of crimes.’ (R. 1712.) Mr. Adair also thanked the jury on behalf of the family thereby implying again that the he represented the victims. (R. .1632.) The State made other improper comments as well. At one point he asked a prospective juror about ‘getting justice for the Crumpton family.’ (R. 331.) He also . asked the jury to ‘speak out to their community for this kind of thing.’ (R. 559.)”
(Shanklin’s brief, p, 62.)
First, - with regard to Shanklin’s claim that the prosecutor engaged in misconduct when he “asked the jury to ‘speak out to their community for this kind thing,’ ” that claim is without merit.
“Here, the prosecutor’s comments ‘ “properly argued the necessity of law enforcement as a deterrent to crime and *792 as &■ píotection of society.” ’ Sneed v. State, 1 So.3d 104, 141 (Ala.Crim.App. 2007), cert. denied, Sneed v. Alabama, 555 U.S. 1155, 129 S.Ct. 1039, 173 L.Ed.2d 472 (2009), quoting Kuenzel v. State, 577 So.2d 474, 503-04 (Ala.Crim. App.1990), affirmed, Ex parte Kuenzel, 577 So.2d 531 (Ala.1991).
‘““In Alabama, the rule is that a district attorney in closing argument may make a general appeal for law enforcement. Embrey v. State, 283 Ala. 110, 118, 214 So.2d 567 (1968).
“ ‘ “This line of argument is ‘within the latitude allowed prosecutors in their exhortations to the jury to discharge their duties in such a manner as, not only to punish . crime, but protect the public from like offenses and as an example to deter others from committing like offenses.’ Varner v. State, 418 So.2d 961 (Ala.Crim.App.1982); Cook v. State, 369 So.2d 1243 (Ala. Crim.App.1977), affirmed in part, reversed in part on other grounds, 369 So.2d 1251 (Ala.1978).”
‘“Ex parte Waldrop, 459 So.2d 959, 962 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). See also Sockwell v. State, 675 So.2d 4 (Ala.Cr.App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996).’
“Ingram v. State, 779 So.2d 1225, 1262-63 (Ala.Crim.App.1999), affirmed, Ex parte Ingram, 779 So.2d 1283 (Ala.2000), cert. denied, Ingram v. Alabama, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). There was no plain error due to this comment by the prosecutor.”
Johnson v. State, 120 So.3d 1130, 1171 (Ala.Crim.App.2009). Here, the prosecutor’s comments amounted to nothing more than a general appeal for law enforcement and, therefore, do not constitute plain error.
Shanklin also contends that the “prosecutor improperly informed the jury that the State represented the victims” on three other occasions. First, Shanklin takes issue with the following exchange during voir dire:
“[Prosecutor]: The fact that I’m going to be prosecuting this case and it’s the same office that brought your case.
“[Prospective juror]: Right.
“[Prosecutor]: Would you hold that against us?
“[Prospective juror]: No.
“[Prosecutor]: In our attempt to get Ms. Crumpton and Ashley Crumpton justice, in this case?
“[Prospective juror]: No, sir.”
(R. 331.) Shanklin also takes issue with the following portion of the State’s rebuttal closing argument:
“I thank you for your service. I know it’s been said by a lot of folks, but I mean that because this is difficult. It was difficult all four times I’ve ever done it. And on behalf of their family, I really appreciate you going through this because I know some of you didn’t want to be here. Thank you.”
(R. 1632.) Finally, Shanklin takes issue with the following portion of the State’s closing argument in the penalty phase of trial:
“It is not lost on me. It is not lost on the victim’s family as to the decisions that have to be made. When I think about these decisions I do appreciate the decisions that have to be made all the way from beginning a prosecution all the way to doing what I’m doing here today. But it’s part of the duty that when I held my hand up and swore an oath for the constitution of this state and the *793 laws of this state and for victims of crime. This penalty is not something any of us want to recommend to the Judge.”
(R. 1712.) These comments, when viewed in context, are not improper, and, even if they were, they do not amount to plain error.
D.
Shanklin contends that the “prosecutor improperly attempted to change evidence in closing.” (Shanklin’s brief, p. 68.) Specifically, Shanklin argues that the evidence presented at trial through Ashley’s testimony established that Shanklin did not shoot either Ashley or Michael. Shanklin further contends that • “[d]uring his rebuttal close, [the prosecutor] apparently did not like the facts the way they came out at trial” and he argued as follows:
“ ‘The only thing Ms. Crumpton got wrong, Ashley Crumpton got wrong as which one of them she popped with a rock. You remember, she said, I popped him with a rock and hit him right in here. Remember that? The only thing she got wrong is which one she popped with the rock. She got Kevin with the rock.’ ”
(Shanklin’s brief, p. 64 (quoting R. 1329-30 (emphasis in original)).) Contrary to Shanklin’s argument on appeal, the prosecutor’s argument did not “change evidence”; rather, the prosecutor’s argument was a reasonable inference based on the evidence presented at trial.
This Court has explained:
“ ““ “During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.” ’ Reeves v. State, 807 So.2d 18, 45 (Ala.Crim. App.2000), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala. Crim.App.1987) (citation omitted), rev’d on other grounds, 523 So.2d 1118 (Ala.1988).
“““ “The test of a prosecutor’s legitimate argument is that whatever is based on facts and evidence is within the scope of proper comment and argument. Kirkland v. State, 340 So.2d 1139 (Ala.Crim.App.), cert. denied, 340 So.2d 1140 (Ala. 1976 [1977]). Statements based on facts admissible in evidence are proper. Henley v. State, 361 So.2d 1148 (Ala.Crim.App.), cert. denied, 361 So.2d 1152 (Ala.1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. Williams v. State, 377 So.2d 634 (Ala.Crim.App.1979); McQueen v. State, 355 So.2d 407 (Ala.Crim.App.1978).” ’
“ ‘ “Ballard v. State, 767 So.2d 1123, 1135 (Ala.Crim.App.1999), writ quashed, 767 So.2d 1142 (Ala.2000), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Crim.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981).”
“‘Johnson v. State, 823 So.2d 1, 47 (Ala.Crim.App.2001).’
“Minor v. State, 914 So.2d 372, 426 (Ala. Crim.App.2004), cert. denied, Minor v. Alabama, 548 U.S. 925, 126 S.Ct. 2977, 165 L.Ed.2d 987 (2006). See Harris v. State, 2 So.3d 880, 921 (Ala.Crim.App. 2007).”
Johnson, 120 So.3d at 1164.
Here, the prosecutor’s argument was based on an inference from the evidence. *794 Although the prosecutor argued that Ashley “got wrong which one she popped with the rock,” the prosecutor explained that Ashley was wrong because “you can look at the photographs of Mr. Kevin Shanklin. I submit to you he’s got within two days of this offense you’ll see the scar right there on his nose.” (R. 1629.) The prosecutor’s argument is grounded in Ashley’s testimony that she struck the individual who put the gun to her head in the face with a rock. Thus, there is no plain error.
XIII.
Shanklin contends that the circuit court erred when it denied his motion for a judgment of acquittal and when it denied his motion for a new trial because, he says, the State “presented insufficient evidence to prove capital murder as charged in the indictment” in that, he argues, the State failed to establish that Shanklin “intentionally killed” Michael. Specifically, Shanklin, in his brief on appeal, contends that the State’s evidence was insufficient and against the great weight of the evidence because, he says, the evidence presented at trial established that he “was not the triggerman.” (Shanklin’s brief, p. 73.) Additionally, Shanklin argues that, although “a non-trig-german can be convicted of capital murder if he was a knowing accomplice to the intentional killing itself’ (Shanklin’s brief, p. 73 (citation and quotation marks omitted)), “the State did not operate under an accomplice liability theory[;]' instead it argued that [Shanklin] was the triggerman.” (Shanklin’s brief, p. 74.) ■
“ ‘ “In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact.” Maddox v. State, 620 So.2d 132, 133 (Ala.Cr.App.1993). Conflicting evidence presents a jury .question not subject to review on appeal, provided that the state’s evidence established a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). . A trial court’s denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App. 1983). Furthermore:
“““ “A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust.” ’ ”
“ ‘McCollum v. State, 678 So.2d 1210, 1215 (Ala.Cr.App.1995), quoting Cox v. State, 500 So.2d 1296 (Ala.Cr.App. 1986), quoting in turn other cases.’
“Presley v. State, 770 So.2d 104, 111 (Ala.Cr.App.1999).”
Broadnax v. State, 825 So.2d 134, 191 (Ala. Crim.App.2000).
'On appeal, 'Shanklin argues only that the State’s evidence demonstrated that he was not the “triggerman” who killed Michael and shot Ashley. When viewed in a light most favorable to the State, however, the evidence presented at trial established that Shanklin told Tracy Ward, Amber Piper, Isaiah Howze, and Tyrone Dickerson that he shot Michael. Additionally, Joshua Moreland testified that Shanklin told him that Shanklin shot Ashley in the leg. Thus, the evidence was *795 sufficient to establish the intent necessary to sustain the convictions for the capital murder of Michael and for the attempted murder of Ashley.
Moreover, although Shanklin correctly argues that evidence was presented at trial that established that he was not the “trig-german,” that evidence merely created a conflict in the State’s evidence for the jury to resolve.
Accordingly, Shanklin is not entitled to relief on this claim.
XIV.
Although Shanklin did not object to the circuit court’s jury instructions during the guilt phase of his trial and does not argue on appeal that the circuit court’s jury instructions during the guilt phase of trial were erroneous, we have reviewed the guilt-phase instructions for plain error. Doing so, we recognize that at one point the circuit court’s instruction on accomplice liability was incorrect.[34] Specifically, with regard to intent under accomplice liability the circuit court instructed the jury that “[w]hen two or more persons join in an unlawful enterprise, each is responsible for everything which may consequently and proximately flow from the unlawful purpose, whether committed by the accused or not and whether specifically intended or not.” (R. 1661 (emphasis add.-' ed).)
It is well settled and
“ ‘Alabama appellate Courts have repeatedly held that, to be convicted of capital offense and sentenced to death, a defendant must have had a particularized intent to kill and the jury must have been charged on the requirement of specific intent to kill. E.g., Gamble v. State, 791 So.2d 409, 444 (Ala.Crim. App.2000); Flowers v. State, 799 So.2d 966, 984 (Ala.Crim.App.1999); Duncan v. State, 827 So.2d 838, 848 (Ala. Crim.App.1999).’
“Ziegler v. State, 886 So.2d 127, 140 (Ala.Crim.App.2003). •
“ ■ “ ‘[N]o defendant' is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine. Beck v. State, 396 So.2d 646, 662 (Ala. March 6,1981)’; Carnes, Alabama’s 1981 Capital Punishment Statute, 42 Ala. Law. 466, 468 (1981). See also E[n]mund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), but see Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App.1982), holding that E[n]mund is inapplicable to a defendant who does not receive' the death penalty. However, ■ a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself. Ritter v. State, 375 So.2d 270 (Ala.1979). ‘[T]he accomplice liability doctrine may be used to convict a non-trigger man *796 accomplice if but only if the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the “underlying felony.” ’ Ex parte Raines, 429 So.2d 1111, 1112 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983).
‘““Alabama’s 1981 capital punishment statute under which [the defendant] was convicted ‘provides that a defendant who does not personally commit the intentional killing which is part of the capital offense is nonetheless guilty of it and can be convicted of the capital offense, if that defendant intentionally promotes or assists in the commission of the intentional killing which is actually done by another.’ Carnes, 42 Ala. Law at 471.
“ ‘ “Our duty on appeal was stated in Raines, 429 So.2d at 1113. ‘To affirm a finding of a “particularized intent to kill”, the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.’ ”
“ ‘Lewis v. State, 466 So.2d 413, 416-17 (Ala.Cr.App.1984).’
“Rowell v. State, 570 So.2d 848, 850-51 (Ala.Crim.App.1990).”
Brown v. State, 72 So.3d 712, 715-16 (Ala. Crim.App.2010).
Although this Court in Brown found plain error in the circuit court’s instructions, this case is distinguishable from Brown. Specifically, Brown was charged with 17 counts of capital murder. The State, when arguing its case to the jury, leaned heavily on proving its ease through accomplice liability. Additionally, when charging the jury, the circuit court, although instructing on specific intent, instructed on numerous occasions that the State had to prove that Brown “intended to kill the deceased, or another person, or another individual who he aided and abetted intended to kill.” Id. at 717. After reviewing the entire instructions, this Court held that “it [was] clear that the trial court did not adequately inform the jury that Brown could not be convicted of capital murder unless it determined that he had the specific, particularized intent to kill.” Id. at 718 (emphasis in original).
Here, unlike in Brown, Shanklin was charged with only two counts of capital murder. Additionally, unlike in Brown, the State, throughout its closing arguments, argued that Shanklin was, in fact, the individual who shot both Michael and Ashley. In fact, the State in its closing argument attempted to discredit evidence of Ashley’s identification of Kevin as the shooter. Additionally, unlike in Brown, the circuit court, when it instructed the jury as to the charges of capital murder, explained that the State had to prove that Shanklin himself “caused the death of [Michael] by shooting him; that in committing the act which caused the death of [Michael], [Shanklin] intended to kill [Michael],” and also that “[t]he intent to kill must be real and specific.” (R. 1645-46, 1651.) Thus, unlike in Brown, after a review of the entire instructions, it is clear that the circuit court adequately instructed the jury that it could not convict Shanklin unless it determined that Shanklin, himself, had the specific, particularized intent to kill.
Accordingly, there is no plain error in the circuit court’s instructions.

Penalty-Phase Issues

XV.
Shanklin contends that the circuit court erred when it allowed victim-impact testimony during the penalty phase of his trial because, he says, that testimony “was *797 irrelevant to finding any statutorily proscribed aggravator and therefore undermined the reliability of [Shanklin’s] sentencing determination.”[35] (Shanklin’s brief, p. 54.) Specifically, ShanMin, in his brief on appeal, contends that the following testimony from Ashley and Lori was improper:
“Each witness was asked to testify about their reaction to [Michael’s] death and significance of the loss of [Michael] in their lives. Ashley ... was specifically asked how the death of Michael ... ‘had impacted [her] and [her] children.’ (R. 1688-89.) Similarly, the victim’s mother, [Lori], was also asked how Michael’s death had impacted her and her family. (R. 1690-91.) The State even asked about financial hardships the family would now face raising [Michael’s] children. (R. 1692.)”
(Shanklin’s brief, p. 53.)
Initially, we note that ShanMin did not object to the complained-of testimony of Ashley and Lori; therefore, we review this claim for plain error.
“In Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the United States Supreme Court overruled two cases that had held that victim-impact evidence and argument cquM not be presented during the penalty phase of a capital-murder trial: Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). The Court held:
‘“[A] State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant. “[T]he State has a legitimate interest in counteracting the mitigating evidence which the defendant is entitled to put in, by reminding the sentencer that just as the murderer should be considered as an individual, so too the victim is an individual whose death represents a unique loss to society and in particular to his family.” Booth, 482 U.S., at 517 (White, J., dissenting) (citation omitted). By turning the victim into a “faceless stranger at the penalty phase of a capital trial,” Gathers, 490 U.S., at 821 (O’Connor, J., dissenting), Booth deprives the State of the full moral force of its evidence and may prevent the jury from having before it all the information .necessary to determine the proper punishment for a first-degree murder.’
“501 U.S. at 825, 111 S.Ct. 2597.”
Gissendanner v. State, 949 So.2d at 963. .
“In Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), [the Alabama Supreme] - Court noted that Payne had only partially overruled Booth and that it had left intact the proscription against victim-impact statements containing ‘characterizations or opinions of the defendant, the crime, or the appropriate punishment.’ 640 So.2d at 1017. The Court in McWilliams held that a trial court errs if it ‘consider[s] the portions of the victim impact statements wherein the victim’s family members offered their characterizations or opinions of the defendant, the crime, or the appropriate punishment.’ Id.”
Ex parte Washington, 106 So.3d 441, 445 (Ala.2011); In other words, although victim-impact .testimony that consists of “characterizations or opinions of the defendant, the crime, or the appropriate punish *798 ment” are inadmissible, the State may elicit victim-impact testimony to the extent that it demonstrates the “specific harm caused by the defendant.”
Here, neither Ashley nor Lori testified as to either their opinion of Shanklin, the crime that was committed, or what they believed would be the appropriate punishment for Shanklin. Ashley and Lori, instead, testified only to how Shank-lin’s actions had specifically harmed them, Ashley’s children, and' their family finances. Additionally, nothing in the record indicates that either the jury’s recommendation or the circuit court’s sentence were based on the complained-of portions of Lori’s and Ashley’s testimony. Indeed, the circuit court, when imposing its sentence, explained that it “disregard[ed] pleas or references to the Court to consider the sentence on the basis of passion or prejudice.” (R. 1762.) Furthermore, the circuit court, when instructing the jury during, the .penalty phase, explained that the jury’s determination must.
' “be based solely on the evidence presented and the law as I have explained to you. ■ :
“Ladies and gentlemen, in determining punishment you must avoid any influence of passion, prejudice or any other arbitrary factor.” .
(R. 1732.) .
Because neither Ashley nor Lori testified as to either their opinion of Shanklin, the crime that was committed, or what they believed would be the appropriate punishment for Shanklin and because nothing in the record demonstrates that the complained-of portions of their testimony were considered in imposing Shank-lin’s sentence, we find no plain error.
XVI. .
Shanklin contends that “errors in sentencing”- require that his death sentence be reversed.[36]
A.
Shanklin contends that the circuit court, in overriding the jury’s sentencing recommendation, “relied upon a number of improper considerations and a misapplication of Alabama law.” (Shanklin’s brief, p. 36.) Shanklin’s argument that the circuit court erred is twofold. First, Shanklin contends that the circuit court, in its summation of the facts of this case, “made reference not only to facts that were not in evidence, but that were also clearly contrary to the evidence presénted by the State.” (Shank-lin’s brief, p. 37.) Second, although it is not clear, it appears Shanklin contends that the circuit court failed to provide a sufficient basis for overriding the jury’s recommendation under Ex parte Carroll, 852 So.2d 833 (Ala.2002), and Ex parte Taylor, 808 So.2d 1215 (Ala.2001). We address each contention in turn.
The circuit court, in its sentencing order, found that the State sufficiently proved the existence of. five aggravating circumstances — namely, (1) that the capital offense was committed by Shanklin while he was under a sentence of imprisonment, see § 13A-5-49(l), Ala.Code 1975; (2) that Shanklin had been previously convicted of two felonies involving the use or threat of violence to "the person — namely, first-degree assault, see § 13A-5-49(2), Ala.Code 1975; (3) that Shanklin knowingly created a great risk of death to many persons, see § 13A-5-49(3), Ala.Code 1975; (4)' that Shanklin committed the capital offense while he was engaged or was an accomplice in the commission of a robbery and a burglary; see § 13A-5-49(4), Ala.Code 1975; and (5) that the capital offense was *799 especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975.[37]
The circuit court then considered each of the statutory mitigating circumstances and found none to exist. The circuit court also considered the nonstatutory mitigating evidence Shanklin presented, including testimony that Shanklin was a “humble and loving family member,” that he “came from a good family,” that he had a “good childhood,” and that he was a “loving husband, loving father to his two children, and a loving son.” (C. 80.) Additionally, the circuit court considered the testimony of Shanklin’s family members asking the jury that Shanklin’s “life be spared.” The circuit court found this testimony to be a nonstatutory mitigating circumstance but concluded that it was “extremely weak and ... assigned] very little weight to these factors.” (C. 82.)
The circuit court also considered the jury’s recommendation of a sentence of life imprisonment without the possibility of parole and assigned the jury’s advisory verdict “great weight,” noting that the jury’s recommendation was “unanimous.” (C. 82.) . : ■
Thereafter, the circuit court rewéighed the aggravating and mitigating circumstances and found that “the aggravating circumstances vastly Outweigh the mitigating circumstances and are sufficient to override the jury’s recommendation that [Shanklin] be sentenced to life without parole” and sentenced Shanklin to death. (C. 89-90.)
1. The Circuit Court’s Factual Findings
Shanklin contends that the circuit court, when summarizing the facts of this case in its sentencing order, “made reference not only to facts that were not in evidence, but that were also clearly contrary to the evidence presented by the State.” (Shank-lin’s brief, p. 37.) Shanklin cites three specific factual findings in the circuit court’s order.
First, Shanklin contends that the circuit court incorrectly found that “Michael Crumpton was shot in the back while running down the hall of his apartment.” (Shanklin’s brief, p. 37.) Although Shank-lin correctly contends that the State’s evi *800 dence established that Michael was shot while he was in his bedroom and that the circuit court found that he was shot in the hallway, the circuit court’s finding of where Michael was when he was shot in the back four times is, at worst, a de minimis factual discrepancy. Shanklin did not object to this complained-of fact in the circuit court, and we cannot conclude that such an.immaterial discrepancy adversely affected a substantial right of Shanklin.
Shanklin also contends that the circuit, court erred when it found that “Shanklin knew that Michael Crumpton sold marijuana and asked Tracy Ward to visit Crumpton earlier that day (actually the afternoon of October 11, 2009) and purchase a quantity of marijuana from him.” (R. 65.) According to Shanklin, the evidence presented at trial “clearly show[s] this was not the case. Tracy Ward testified that Clayton did not know Michael Crumpton. She also unequivocally testified that it was her idea to purchase marijuana from him that night.” (Shanklin’s brief, p. 37.) Shanklin’s argument is correct to the extent that the circuit court found that it was Shanklin’s idea to purchase marijuana from Michael on October 11, 2009. There is evidence, however, supporting the circuit court’s finding that Shanklin knew that Michael sold marijuana;[38] Shanklin incorrectly argues that there was no basis for the circuit court to find that Shanklin knew Michael sold marijuana. Specifically, at trial, Isaiah Howze and Tyrone Dickerson testified that before October 12, 2009, Shanklin approached them about committing a robbery at an apartment in Cordova for “weed and money.” When considering all the facts of this case, it is certainly reasonable to draw the inference that Shanklin both knew Michael and knew that Michael sold marijuana. Shanklin did not object to this complained-of finding of fact in the circuit court, and we cannot conclude that, to the extent the circuit court was incorrect about whose idea it was to purchase marijuana from Michael, that evidentiary misstep adversely affected a substantial right of Shanklin.
Shanklin contends that the circuit court erred when it found that Ashley “testified about experiencing the pain of watching her husband pass away on the floor of their living room” (R. 66), because, he says, Ashley testified “that she was in an entirely different apartment when her husband passed away.” (Shanklin’s brief, p. 38.) At trial, Ashley testified that she saw Michael get shot four times in the back, that Michael told her that he was not okay, and that “[Michael] looked pale. He couldn’t breathe and he was just hurting.” Regardless of where Ashley was located when Michael ultimately died, Ashley certainly “experienced] the pain of watching her husband pass away.” Moreover, Ashley did, in fact, testify that she saw Michael in their apartment after he died. (R. 579.) Again, Shanklin did not object to this complained-of finding of fact in the circuit court, and we cannot conclude that the circuit court’s finding was error, much less plain error.
2. The Circuit Court’s Basis for Judicial Override.
Shanklin contends that the circuit court failed to provide a sufficient basis for overriding the jury’s recommendation under Ex parte Carroll, 852 So.2d 833 (Ala.2002), *801 and Ex parte Taylor, 808 So.2d 1215 (Ala. 2001).
This Court has explained:
“In Taylor, the Alabama Supreme Court held that, based on the requirements of § 13A-5-47(d) and (e), Ala. Code 1975, ‘the trial judge must state specific reasons for giving the jury’s recommendation the consideration he gave it.’ 808 So.2d at 1219....
“In Carroll, the Alabama Supreme Court stated:
‘“We take this opportunity to further explain the effect of a jury’s recommendation of life imprisonment without the possibility of. parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of ■ the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the “triggerman” or a recommendation of leniency by the victim’s family; the jury’s recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’
“Carroll, 852 So.2d at 836 (emphasis added). In [Ex parte] Tomlin, the Alabama Supreme Court held that a 12-0 jury recommendation of life imprisonment without the possibility of parole was entitled to ‘great weight.’ 909 So.2d [283,] at 286 [(Ala.2003)].”
Stanley v. State, 143 So.3d 230, 325-26 (Ala.Crim.App.2011) (opinion on remand from the Alabama Supreme Court).
Here, the circuit court complied with Taylor, Carroll, and Ex parte Tomlin, 909 So.2d 283 (Ala.2003). Specifically, the circuit court, as required by Taylor and Carroll, provided its “specific reasons for giving the jury’s recommendation the consideration [the circuit court] gave it.” Taylor, 808 So.2d at 1219. Specifically, the circuit court explained:
“Carroll and [Ex parte] Martin [, 931 So.2d 759, 771 (Ala.2004),] require that this Court address its reasons for overriding the jury’s advisory recommendation. Using the factors outlined in Carroll, this Court distinguishes Carroll from the facts of this case.
“(a) Number of Jurors Recommend- . ing Life: In Carroll, ten jurors recommended life without parole. In this case, all twelve jurors made such a recommendation. While no court is able to read the minds of a jury, the mandates of Carroll and Martin seemingly require this Court to do just that.
“Based on the overwhelming evidence in this case and the unanimous verdicts on both counts of capital murder (and the attempted murder count as well), it is not easy to understand why all twelve members of the jury voted against the death penalty in this case. There is evidence that several jurors emotions may have hindered their ability to follow the law and impose the death penalty. The aggravating circumstances clearly weigh in favor of the death penalty. [Shanklin] presented no evidence of any statutory mitigating factors. The non-statutory mitigating factors concerning family factors and character, etc., were extremely weak and this Court assigns very little weight to these factors. The only real mitigating circumstance is the jury’s recommendation of life without parole which, was unanimous, and given great weight by this Court.
*802 “(b) Conflicting Evidence of the ‘Trig-german’: While the facts in Carroll may have left.some doubt as to the identity of the ‘triggerman,’ the overwhelming evidence in this case pointed to Shanklin as the major perpetrator. The State presented an eyewitness who w;as present at the scene and was herself a victim of the crime. The State also presented testimony, from a codefendant, Tracy Ward, 'who clearly pointed out Shank-lin’s role in the crime and his admission to the shooting of Michael Crumpton. The jury unanimously found that Shank-lin intentionally killed Michael Crump-ton. There is no doubt whatsoever as to [Shanklin’s] involvement in this horrific crime, as there apparently was in Carroll. Accordingly, in comparison to Carroll, judicial-override is. proper in this case.
“(c) Recommendation of the Victim’s Family: In Carroll, the victim’s family recommended Carroll not receive the death penalty. No one from Michael Crumpton’s family made such a recommendation in this case. While there was no testimony-elicited (and this Court would not have allowed such testimony) from Michael Crumpton’s family as to their -recommendations for Shanklin’s sentence, this Court has little doubt that it would have been .the death penalty. Accordingly, in comparison to Carroll, judicial override is.proper in this case.
“(d) Facts of the Crime/Not Killing the Witnesses: It is accurate that Shanklin - did not kill Ashley Crumpton (although there was an attempt on her life) and the two infant children in the apartment. Shanklin did, however, threaten .to kill Amber Piper, and her small child if she ‘told’ anyone’ about his admission to the crime. It seems unbearably cruel to force anyone to watch or live through the slaughter of another person, especially when the .witness is related to that person. Yet,.that is what also happened in Carroll, and the Alabama Supreme Court found that this factor tipped in favor of a life without parolé sentence. Although with grave reservation, this Court gives the absolute minimum consideration of this factor as tipping the scales in favor of the jury’s recommendation in light of Carroll.
“(e) Additional Facts Unknown to the Jury: Finally, Carroll also allows this Court to consider ‘information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.’ Carroll, 852 S6.2d at 836. The Court does have knowledge of Shanklin’s ■ criminal history which was unknown to the jury. The - defendant was originally charged with Attempted Murder in CC-2006-4973 and 4974 (Jefferson County, Alabama) which resulted in his pleading to Assault in the First Degree in both cases. In addition, Shanklin has had numerous arrests including Possession of a Controlled Substance, Use/Possession of Drug Paraphernalia, Burglary in the First Degree, Robbery in the First Degree, Theft of Property in the First Degree, Burglary in the [Third] Degree, Theft of Property in the [Second] 'Degree, and Trafficking Illegal Drugs. This information conceivably could- have weighed against the ‘non-statutory mitigating circumstances’ if known by the jury, particularly the testimony from Shanklin’s family members regarding his character. Accordingly, this court places minimal weight of this ‘information known only.to the trial court and not to the- jury’ as a justification for an override.
“As-clearly shown above, this case is clearly distinguishable from Carroll. Because only one of the factors listed by *803 the Alabama Supreme Court in Carroll as ‘tipping the scales in favor of following the jury’s recommendation’ applies in this case, and that one just minimally, this court sees no legal impediment to overriding the jury’s recommendation.”
(C. 81-85.)
The circuit court further justified its override of the.jury’s recommendation:
“In this case, several jurors were visibly upset upon- entering the courtroom to render their verdict at the conclusion of the guilt phase. In addition, at the conclusion of the rendering of the verdict at the guilt phase, there was ah outburst among persons in the audience in the courtroom, requiring order to be restored. The courtroom was ordered vacated and the jury was quickly sequestered in the jury room. A recess was taken before the commencement of the penalty phase of the trial. During this break, several members of the jury asked the bailiff if the results of the penalty phase portion of the trial would be made public. This judge presiding over the case .was summoned and explained to the jury that the penalty phase portion of the trial would indeed be public. There was a look of concern and consternation on the faces of several of the jurors,... [I]t is very likely these jurors, although very cooperative, diligent, and attentive throughput the trial, were unable to carry out their sworn legal obligation during sentencing. This Court holds that, this was likely a key factor in the jury’s vote recommending a sentence of life without, parole in the face of the overwhelming weight of the aggravating circumstances.”[39]
(C. 88-89.) Under Taylor, the circuit court’s justification for overriding the jury’s recommendation is not impermissible. Additionally, the circuit court’s sentencing order • complied with Tomlin by assigning the. jury’s recommendation “great, weight” based on its 12-0 recommendation for life imprisonment without the possibility of parole.
Consequently, Shanklin’s argument that the circuit court’s sentencing order was insufficient under Carroll and Taylor is without merit.
B.
Shanklin contends that his sentence is unconstitutional because, he says, “two of the aggravating circumstances authorizing [his] death sentence overlap with elements of the crime.” (Shanklin’s brief, p. 42.) Specifically, Shanklin argues that
“Alabama’s capital punishment scheme, which permits dual consideration of these factors [that the murder was made capital because it occurred during a first-degree burglary and. a first-degree robbery] as .both elevation in the first phase and as aggravation in the penalty phase, is unconstitutional because it fails to narrow the. class of individuals eligible . for the death penalty and results in the arbitrary imposition of the death penalty.”
(Shanklin’s brief, pp. 42-43.)
Shanklin’s “dual consideration” claim— also often referred to as a-“double-counting” or an “overlap” claim — however, has been rejected by both this Court and the Alabama Supreme Court.
*804 Specifically, in Ex parte Windsor, 683 So.2d 1042 (Ala.1996), the Alabama Supreme Court explained:
“ ‘The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as “double-counting” or “overlap” and is constitutionally permissible. Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 646, 98 L.Ed.2d 568 (1988); Ritter v. Thigpen, 828 F.2d 662 (11th Cir.1987); Ex parte Ford, 515 So.2d 48 (Ala.1987), cert. denied, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
“ ‘Moreover, our statutes allow “double-counting” or “overlap” and provide that the jury, by its verdict of guilty of the capital offense, finds the aggravating circumstance encompassed in the indictment to exist beyond a reasonable doubt. See §§ 13A-5-45(e) and -50[, Ala.Code 1975]. “The fact that a particular capital offense as defined in section 13A-5-40(a)[, Ala.Code 1975,] necessarily includes one or more aggravating circumstances as specified in section 13A-5-49[, Ala.Code 1975,] shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.” § 13A-5-50[, Ala.Code 1975].’
“Coral v. State, 628 So.2d 954, 965-66 (Ala.Cr.App.1992). See also Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993). The trial court correctly considered the robbery as an aggravating circumstance.”
683 So.2d at 1060. See. also Ex parte Woodard, 631 So.2d 1065, 1069-70 (Ala. Crim.App.1993); Ex parte Trawick, 698 So.2d at 178; McCray v. State, 88 So.3d 1, 74 (Ala.Crim.App.2010); McMillan v. State, 139 So.3d 184, 265 (Ala.Crim.App. 2010); Reynolds v. State, 114 So.3d 61, 157 (Ala.Crim.App.2010); Morris v. State, 60 So.3d 326, 380 (Ala.Crim.App.2010); Vanpelt v. State, 74 So.3d 32, 89 (Ala.Crim. App.2009); Newton, v. State, 78 So.3d 458 (Ala.Crim.App.2009); Brown v. State, 11 So.3d 866, 929 (Ala.Crim.App.2007); Mashburn v. State, 7 So.3d 453 (Ala.Crim. App.2007); Harris v. State, 2 So.3d 880, 926-27 (Ala.Crim.App.2007); Jones v. State, 946 So.2d 903, 928 (Ala.Crim.App. 2006); Barber v. State, 952 So.2d 393, 458-59 (Ala.Crim.App.2005); and McGowan v. State, 990 So.2d 931, 996 (Ala.Crim.App. 2003). Because “dual consideration” is constitutionally permitted and statutorily required, Shanklin is not entitled to relief on this claim. See § 13A-5-45(e), Ala. Code 1975.
C.
Shanklin contends that “[t]he use of judicial override is unconstitutional as it is used in Alabama” because, he says, in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court held that “ ‘[c]apital defendants ... are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.’ ” (Shanklin’s brief, p. 44 (quoting Ring, 536 U.S. at 589).) Although Shanklin recognizes that this claim has been decided adversely to him by the Alabama Supreme Court in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), Shanklin maintains that “Ring invalidated critical aspects of Alabama’s capital sentencing scheme and renders his death sentence unconstitutional.” (Shanklin’s brief, p. 44.) Thus, Shanklin is, in essence, asking this Court to overrule Ex parte Waldrop, *805 which we cannot do. See Harris v. State, 2 So.3d 880, 902 (Ala.Crim.App.2007) (“We are bound by the decisions of the Alabama Supreme Court, arid this court ‘is without authority to overrule the decisions of [that] court.’ Jones v. City of Huntsville, 288 Ala. 242, 244, 259 So.2d 288, 290 (1972).”). See also § 12-8-16} Ala.Code 1975 (“The decisions of the Supreme Court, shall govern the holdings and decisions of the courts of appeals, and the decisions and proceedings of such courts of appeals shall be subject to the. general superintendence and control of the Supreme Court as provided by Constitutional Amendment No. 328.”). Consequently, Shanklin is not entitled to relief on this claim. .
D.
Shanklin contends 'that the “Eighth Amendment’s prohibition on cruel and unusual punishment and the evolving standards of decency renders the death penalty, as used in Alabama, unconstitutional.” (Shankliri’s brief, p. 44.) Specifically, Shanklin contends that,
“[although the Supreme Court upheld ' Kentucky’s lethal injection protocol in Baze[ v. Rees, 553 U.S. 35, 51-53 (2008),] based on the record in that ease, Alabama’s protocol is not ‘substantially similar’ to Kentucky’s. Id. at 1537. Alabama’s undeveloped procedures for administering lethal injection pose á substantial risk of inflicting unnecessary pain and violate evolving standards of decency.”
(Shanklin’s brief, p. 45.) This claim, however, has been decided adversely to Shank-lin.
In Gobble v. State, 104 So.3d 920 (Ala. Crim.App.2010), this Court explained:
“Alabama’s method of performing lethal injection, a three-drug protocol, is substantially similar to the one considered by the United States Supreme Court in Baze v. Rees.
“The Alabama Supreme' Court in Ex parte Belisle, 11 So.3d 323 (Ala.2008), held that Alabama’s method of performing lethal injection' does not constitute cruel and unusual punishment. The Court stated:
“‘The Eighth Amendment to the United States Constitution provides: “Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.” ‘ “Punishments are cruel when they in-volye torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, — something more than the mere extinguishment of life.” In re Kemmler, 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). However, as the Supreme Court of the United States recently stated in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008):
“ ‘ “Our cases recognize that subjecting individuals to a risk of future harm — not simply actually inflicting pain — can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must • be ‘sure or very likely to cause serious illness and needless suffering,’ and give rise to ‘sufficiently imminent dangers.’ Helling v. McKinney, 509 U.S. 25, 33, 34-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a ‘substantial risk of serious harm,’ an ‘objectively intolerable risk, of .harm’ that prevents prison officials from pleading *806 that they were ‘subjectively blameless for purposes of the Eighth Amendment.’ Farmer v. Brennan, 511 U.S. 825, 842, 846, and n. 9, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).”
„ “ ‘553 U.S. at 49-50, 128 S.Ct. at 1530-31.
“‘In Baze, two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing “that there is a significant risk that the procedures will not be properly followed — in particular, that the sodium thiopental will not be properly administered to achieve its intended effect— resulting in severe pain when the other chemicals are administered.” 553 U.S. at 49,128 S.Ct. at 1530. Belisle’s claim, like the claims made by the inmates in Baze, “hinges on the improper administration of the first drug, sodium thiopental.” Baze, 553 U.S. at 53, 128 S.Ct. at 1533.
“‘The Supreme Court upheld the " constitutionality of Kentucky’s method of execution, Baze, 553 U.S. at 62-64, 128 S.Ct. at 1538, and noted that “[a] State with a lethal injection protocol . substantially similar to the protocol we uphold today would not- create a risk that meets this standard.” Baze, 553 U.S. at 61, 128 S.Ct. at 1537. ... Justice Ginsburg and Justice Souter dissented from the main opinion, ar- .- guing that “Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.” Baze, 553 U.S. at 114, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices . recognized, however, that Alabama’s procedures, along with procedures used, in Missouri, California, and Indiana “provide a degree of assurance — missing from Kentucky’s protocol — that - the first drug had been properly administered.” Baze, 553 U.S. at 121, 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“ ‘The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden 'of demon- - strating that Alabama’s lethal-injection' protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. “Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of ‘objectively intolerable risk of harm’ that qualifies as cruel and unusual.” Baze, 553 U.S. at 50, 128 S.Ct. at 1531. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.’
“11 So.3d at 338-39. Alabama’s method of performing lethal injection is not cruel and unusual.”.
104 So.3d at 977-79. Because Alabama’s method of performing lethal injection is “substantially similar” to the one considered by the United States Supreme Court in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008), it is not “cruel and unusual,” and, consequently, Shanklin is not entitled to relief on this claim.
' XVII.
Shanklin contends that he “was sentenced to death under an unconstitutionally vague aggravating circumstance; that the alleged murders were especially ‘heinous, atrocious, or cruel’ ... when compared to other capital offenses.”[40] (Shanklin’s brief, p. 74 (quoting § 13A-5- *807 49(8), Ala.Code 1975),) Specifically, Shanklin, in his brief on appeal, appears to raise two arguments: first, that § 13A-5-49(8), Ala.Code 1975, is unconstitutionally vague; second, “[e]ven if not unconstitutionally vague, the facts from this case certainly do not fit the description of ‘conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ ” (Shankliris brief, p. 75.)
As to Shanklin’s first argument — that § 13A-5-49(8), Ala.Code 1975, is unconstitutionally vague — this Court, in Minor v. State, 914 So.2d 372, 437 (Ala.Crim.App. 2004), rejected the precise .argument Shanklin now raises on appeal, explaining:
■ “With respect to Minor’s constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance in § 13A-5-49(8), Ala.Code 1975, this Court has repeatedly upheld that circumstance against similar challenges. See Duke v. State, 889 So.2d 1 (Ala. Crim.App.2002); Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App. 1999), aff'd, 776 So.2d 203 (Ala.2000); Bui v. State, 551 So.2d 1094 (Ala.Crim. App.1988), aff'd, 551 So.2d 1125 (Ala. 1989), judgment vacated on other grounds, 499 U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App. 1988), aff'd, 548 So.2d 547 (Ala.1989).”
Thus, Shanklin is not entitled to relief as to that claim.
. As to Shanklin’s second argument — that “the facts from this case certainly,do not fit the description of ‘conscienceless or pitiless homicides which are unnecessarily torturous to the victim’ ” — that claim is without merit. Shanklin, in his brief on appeal, argues that
“[e]ven accepting the State’s facts as true, there is nothing .to suggest that this crime was the worst of the worst. It was a robbery gone bad, where a man was shot in the back. He was not tortured in any way. If this crime fits into the framework of heinous, atrocious, or cruel then so too does every single homicide ever committed.”
(Shankliris brief, p. 75.)
Thus, it appears that Shank-liris argument on appeal is that Shankliris actions, as a matter of law, do not rise to the level of “heinous, atrocious, and cruel.” Shanklin, however, does not cite any authority to support his claim.. Consequently, Shankliris argument does not satisfy Rule 28(a)(10), Ala. R.App. P. Regardless, Shanklin’s claim is without merit.
“This Court has stated the following concerning the application of this aggravating circumstance:
“ ‘The especially heinous, - atrocious, or cruel aggravating circumstance “appl[ies] to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.” Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), citing State v. Dixon, 283 So.2d 1 (Fla.1973). ' ‘
“ ‘ “ ‘There are three factors generally recognized as indicating that ’ a capital offense is especially heinous, atrocious, or Cruel: (1) the infliction on the victim of physical •violence beyond that necessary or sufficient to cause death; .(2) appreciable suffering by the victim after the .assault that .ultimately resulted in death; and (3) the infliction of psychological torture on, the victim.’'” ■ - •
“ ‘Saunders [v. State ], 10 So.3d [53] at 108 [(Ala.Crim.App.2007)] (quoting Brooks [v. State], 973 So.2d [380] at 417-18 [(Ala.Crim.App.2007)], citing in turn Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999)).’
*808 “Stanley v. State, 143 So.3d 230, 312 (Ala.Crim.App.2011).”
Boyle v. State, 154 So.3d 171, 242-43 (Ala. Crim.App.2013). Additionally,
“ ‘[o]ne factor this Court has considered particularly indicative that a murder is “especially heinous, atrocious or cruel” is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture “must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering.” Norris v. State, 793 So.2d 847, 861 (Ala.Crim. App.1999).’
“Ex parte Key, 891 So.2d 384, 390 (Ala. 2004). See also White v. State, 587 So.2d 1218, 1234 (Ala.Crim.App.1990) (noting that ‘[e]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel. Ex parte Whisenhant, 555 So.2d 235, 243-44 (Ala.1989), cert. denied, [496] U.S. [943], 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).’).”
Baker v. State, 87 So.3d 587, 604 (Ala. Crim.App.2009) (emphasis added).
Here, the evidence presented at trial established the existence of all three heinous, atrocious, and cruel factors. As to the first factor, the State’s evidence at trial established that Michael was subject to “physical violence beyond that necessary or sufficient to cause death.” Specifically, Ashley testified that Michael was struck on the head with a large rock and was shot in the back four times. According to Dr. Ward, Michael had an injury on the back of his head consistent with being struck with a gun or a rock and had other facial injuries that were the result of a “tremendous amount of force.” Additionally, Dr. Ward testified that Michael received four gunshot wounds but was killed by only one of those shots. Dr. Ward testified that two of the other bullets broke Michael’s ribs and would have caused “severe pain.”
As to the second factor, the State’s evidence demonstrated that Michael experienced “appreciable suffering” before he died. Specifically, the evidence established that Michael was awakened when two individuals entered his bedroom and were fighting Ashley. At that time, Michael began fighting one of the individuals, was struck several times by a large rock, and was shot four times in the back. Michael, however, did not die quickly; rather, the testimony at trial indicated that Michael lived for “several minutes.” According to Ashley, Michael was pale and had difficulty breathing. Dr. Ward testified that Michael suffered “a slow, relatively agonizing death,” explaining:
“Once the bullet went through the heart and the vena cava, those areas started to bleed. Because the bullet is coming from the back of the heart to the front, the blood left the sac of the heart first of all and went into the right side of his chest. So, we found about a liter of blood in the right side of his chest and the chest wall is fixed relatively. So if you put a liter of blood, and you can just visualize a two liter bottle of soda and half of that amount of volume is in the right side of his chest so his lung is not going to be able to expand well because the blood is going to keep it from expanding. And that means he can’t take a deep breath of air and he is going to get the sensation of smothering or of not being able to breathe. In addition to that, the blood does collect eventually inside that sac around the heart and that is going to mean that his heart can’t *809 expand and contract when it beats, so he is going to have a sensation that he is not getting enough blood to his brain and to the rest of his body and at the same time he is suffering from not being able to get a good breath of air, so it would be the equivalent of smothering.”
(R. 1461-62.)
As to the third factor, the State’s evidence demonstrated that Michael was “in intense fear and [was] aware of, but helpless to prevent, [his] impending death.” Specifically, as noted above, Michael lived for several minutes after being shot four times in the back and walking with Ashley down the hallway into their livingroom. According to Ashley, they
“both walked to the sofa, the loveseat, and he has his gun in his hand and I asked him just to put it down and he drops the gun on the couch. And I asked him if he was okay, and he looked at me and asked me if I were okay and he said no. And I told him I was fíne, I had just been shot in the leg. I went to try to open the front door and my hands were shaking so bad I couldn’t open it so he opened it for me. And I told him I was going to call an ambulance so I ran back down the hallway to get our phone that usually sits on the computer stand.
[[Image here]]

“[Michael] looked pale. He couldn’t breathe and he was just hurting.”

(R. 617-18.)
Thus, contrary to Shanklin’s argument on appeal, the evidence presented at trial indicated that this capital offense was especially heinous, atrocious, or cruel. Accordingly, Shanklin is not entitled to relief on this claim.
XVIII.
Shanklin contends that he “was unconstitutionally charged, convicted[,] and sentenced for a single act.”[41] (Shanklin’s brief, p. 76.) Specifically, Shanklin argues:
“The capital murder counts were not materially distinguishable and each was based on the exact same act. Because the same facts and circumstances gave rise to the two capital murder counts, the indictment violated state and federal law prohibiting double jeopardy.”
(Shanklin’s brief, p. 76.) Shanklin did not first raise this argument in the circuit court; thus, we review this claim for plain error.
Although Shanklin contends that his convictions for murder made capital because it was committed during the course of a robbery and murder made capital because it was committed during the course of a burglary violate double-jeopardy principles, this precise issue was decided adversely to Shanklin in Belisle v. State, 11 So.3d 256, 280 (Ala.Crim.App. 2007), in which this Court held:
“Belisle was charged and convicted for two counts of capital murder for murdering Joyce Moore during the course of a burglary and a robbery, violations of §§ 13A-5-40(a)(2) and (a)(4), AlaCode 1975. Both require proof of different elements — one a burglary and one a robbery — and do not offend the Double Jeopardy Clause. ‘A defendant can be convicted of two or more capital murders for the death of one victim, so long as those convictions are in accordance with Blockburger [v. United States, 284 U.S. 299 (1932) ], i.e., so long as each conviction required an element not required in the other convictions.’ Heard v. State, 999 So.2d 992, 1009 (Ala.2007). See also Ex parte Haney, 603 So.2d 412, *810 419 (Ala.1992); Ex parte Peraita, 897 So.2d 1227 (Ala.2004); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993); Castillo v. State, 925 So.2d 284 (Ala.Crim.App. 2005); Flowers v. State, 922 So.2d 938 (Ala.Crim.App.2005); White v. State, 900 So.2d 1249 (Ala.Crim.App.2004); Wynn v. State, 804 So.2d 1122 (Ala.Crim.App. 2000); Barksdale v. State, 788 So.2d 898 (Ala.Crim.App.2000); Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999); Burtram v. State, 733 So.2d 921 (Ala. Crim.App.1998); Hyde v. State, 778 So.2d 199 (Ala.Crim.App.1998); Madison v. State, 718 So.2d 90 (Ala.Crim, App.1997); Merriweather v. State, 629 So.2d 77 (Ala.Crim.App.1993).
“Belisle’s convictions for two counts of capital murder for murdering Moore during the course -of a burglary and ,a robbery, do not violate the Double Jeopardy Clause.”
Similarly, Shanklin’s two convictions -for causing''the death of- Michael during the course of burglary and during the course of a robbery do not violate the Double Jeopardy-Clause.
Accordingly, Shanklin is not entitled to relief on this claim.
xix. - -
Shanklin contends that the “cumulative effect of the errors committed at trial requires reversal”[42] (Shanklin’s' brief, p. 79.) This claim is without merit.
. This Court has recently explained:
“ ‘ “ ‘The Alabama Supreme Court has set forth the cumulative-error rule as follows: “[W]hile, under the facts of a particular case, no single error .among multiple errors may be sufficiently prejudicial to re- • quire reversal under Rule 45, if the accumulated errors have ‘probably injuriously affected substantial rights of the parties,’ then , the cumulative effect of the errors may require reversal.” Ex parte Woods, 789 So.2d 941, 942-43 n. 1 (Ala. 2001) (quoting Rule 45, Ala. R.App. P.). Applying this standard to Lewis’s allegation of cumulative error, we have scrupulously reviewed the record and find no evidence that the cumulative effect of any of -the individually nonreversible errors in this case affected Lewis’s substantial rights at trial.’'
“ ‘ “Lewis v. State, [24 So.3d 480, 538 (Ala.Crim.App.2006)].”
“ ‘Sharifi v. State, 993 So,2d 907, 946-47 (Ala.Crim.App.2008).’
“Petric v. State, [157] So.3d [176], 253 (Ala.Crim.App.2013).
“Each of the issues cited by Jackson has been decided adversely to his claim. The cumulative effect of any individually nonreversible errors did not affect Jackson’s substantial rights. See also Ex parte Walker, 972 So.2d 737, 747 (Ala.2007)(‘Beeause Walker has not demonstrated that his claims of prosecutorial misconduct are any stronger when .the instances of misconduct are considered cumulatively, we find no error.’).”
Jackson v. State, 169 So.3d 1, 119 (Ala. Crim.App.2010) (opinion' on return to second remand).
- Here, although Shanklin raises numerous claims of “cumulative error” throughout his brief on appeal, “[t]he cumulative effect of any individually nonreversible errors” did not affect Shanklin’s substantial rights.
*811 XX. •
Pursuant to § 13A-5-53, Ala.Code 1975, this Court is required to address the propriety of Shanklin’s convictions and sentence of death.
As set out above,’ Shanklin was indicted for and convicted of one count of murder made capital for intentionally taking the life of Michael Crumpton during the course of a first-degree robbery, see § 13A-5-40(a)(2), Ala,Code 1975; a second count of capital murder for taking the life of Michael during the course ,of a first-degree burglary, see § 13A-5-40(a)(4), Ala.Code 1975; and one count of attempt: ed murder, for attempting to cause the death of Ashley Crumpton, Michael’s wife, see §§ 13A-4-2 and r 13A-6-2, Ala.Code 1975.
The record does not demonstrate that Shanklin’s sentence of death was imposed as the result of the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53(b)(l), Ala.Code 1975.
Additionally, the circuit court correctly found that the aggravating circumstances outweighed the mitigating circumstances. The circuit court, in its sentencing order, found five aggravating circumstances— specifically, (l)’that the capital offense "was committed by Shanklin while he was under a sentence of imprisonment, see § 13A-5-49(1), Ala.Code 1975; (2) that Shanklin had been previously convicted of two felonies involving the use or threat of violence to the person — namely, first-degree assault, see § 13A-5-49(2), Ala.Code 1975; (3) that Shanklin knowingly created a great risk of death to many persons, see § 13A-5-49(3), Ala.Code 1975; (4) that Shanklin committed the capital offense while he was engaged or was an accomplice in the commission of a robbery and a burglary, see § 13A-5-49(4), Ala.Code 1975; and (5) that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The circuit court then considered each of the statutory mitigating circumstances and found none to exist. The circuit court also considered the nonstatutory mitigating evidence Shanklin presented, including: (1) the testimony of Shanklin’s aunt and uncle, Willo-dean and Jackie Shanklin, that Shanklin was “a humble and loving family member and came from a good family and asked that [Shanklin’s] life be spared” (C. 80); (2) the. testimony of Shanklin’s father, Clayton Shanklin, Sr., that Shanklin “had a good childhood and was a good person” and his plea that Shanklin’s “life be spared” (C. 80); (3) the testimony of Marie Coleman, Shanklin’s wife, that Shanklin “was a loving husband, loving father to his two children, and a loving son and family member” and her plea that Shanklin’s “life be spared” (C. 80); and (4) that the jury recommended a sentence of life in prison without the possibility of parole. The circuit court’s sentencing order shows that it properly weighed the aggravating circumstances and the mitigating circumstances and that it correctly sentenced Shanklin to death. The record supports the circuit court’s findings.
Section 13A-5-53(b)(2), Ala.Code 1975, requires this Court to reweigh the aggravating . and mitigating circumstances in order to determine whether Shanklin’s sentence of death is appropriate. After independently weighing the aggravating and mitigating circumstances, this Court concludes that Shanklin’s sentence of death is, in fact, appropriate.
As required by § 13A-5-53(b)(3), Ala. Code 1975, this Court must now determine whether Shanklin’s sentence is excessive or disproportionate when compared to the penalty imposed in similar cases. In this case, Shanklin was convicted of murder made capital because it was committed *812 during a first-degree robbery and murder made capital because it was committed during a first-degree burglary. Sentences of death have been imposed for similar crimes in Alabama. See, e.g., White v. State, 179 So.3d 170 (Ala.Crim.App.2013) (opinion on return to remand); Hosch v. State, 155 So.3d 1048 (Ala.Crim.App.2013); Belisle v. State, 11 So.3d 256 (Ala.Crim. App.2007); Flowers v. State, 922 So.2d 938 (Ala.Crim.App.2005); Walker v. State, 932 So.2d 140 (Ala.Crim.App.2004); Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996); Gaddy v. State, 698 So.2d 1100 (Ala.Crim, App.1995); and Bush v. State, 695 So.2d 70 (Ala.Crim.App.1995). Therefore, this Court holds that Shanklin’s death sentence is neither excessive nor disproportionate.
Lastly, this Court has searched the entire record for any error that may have adversely affected Shanklin’s substantial rights and has found none. See Rule 45A, Ala. R.App. P.
Accordingly, Shanklin’s convictions and sentence of death are due to be affirmed.
AFFIRMED.
WINDOM, P.J., and KELLUM and BURKE, JJ., concur.
WELCH, J., concurs in part and concurs in the result in part, with opinion.

. Ward testified that she pleaded guilty to murder, see § 13A — 6—2(a)(3), Ala.Code 1975, and, as a result of a plea agreement, was sentenced to 20 years’ imprisonment, which sentence was split and she was ordered to .serve 5 years! imprisonment. According to Ward, as part of her plea agreement, she "agreed to tell the truth on every related matter of this case.” (R. 685.)

. According to the evidence presented at trial, multiple telephone calls reporting the incident were made to 911.

.According to Howze, before October 12, Shanklin had told him that he “had a lick,” which, Howze explained, was “a robbery” and that the place had "some weed or some money.”

. Like Howze, before October 12, Shanklin told Dickerson that he "was gonna ... hit a lick,” which, he said, was going .to happen “[s]omewhere in Cordova.” (R. 834, 836.)

. MySpace is an online, social-networking Web site.

. The circuit court, in its instructions to the jury, did not charge the jury as to any lesser-included offenses. The circuit court did not do so, in part, because Shanklin filed an affidavit with the circuit court requesting that the circuit court not charge the jury as to lesser-included offenses, (C. 44-45.) The circuit court granted Shanklin’s request on the record. (R. 1633-34.)

. Shanklin, in his brief on appeal, asserts this claim as Issue VI. Because he contends in this *754 claim that the appellate record is insufficient and requires reversal, we address this issue first.

. Notably, many of the omissions referenced by Shanklin in his appellate brief are off-the-record discussions that are immediately followed by the circuit court’s announcing to the *756 jury that it would take a short break, to recess for lunch, or to recess for the day. (R. 681, 757, 879, 925, 1041-42, 1351, and 1490-91.) Additionally, although Shanklin contends that an off-the-record discussion appears at page 184 of the trial transcript, no off-the-record discussion is indicated on page 184 of the trial transcript.

. See Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. This is addressed as Issue XI in Shanklin's initial brief on appeal.

. During the suppression hearing neither Shanklin nor'the State-asked Chief Bobo the substance of the statements Shanklin was alleged to have made when he was picked up at the Albertville Police Department. When arguing the motion to suppress, however, the State explained.that Shanklin told Chief Bobo the following:
" ‘I want to tell my side of the story. And the girl did not have anything to do with it,’ That’s one of the statements that he made.
"And [Shanklin] asked them how they found him. And [Shanklin] said, ‘I’ll bet it was from my cell phone, because I sent a text message.’ ”
(R. 25.) The State's explanation of what Shanklin said to Chief Bobo is consistent with the evidence presented at trial.

. This, is presented as Issue I in Shanklin’s brief on appeal.

. "LETS” is an acronym for the Law Enforcement Tactical System database.

. As noted above, the readouts used in the photo lineup are either LETS sheets or inmate-detail sheets from the Alabama Department of Corrections.,

. Two printouts — neither of which are Shanklin’s — have a different background and include a side-facing photograph.

. Shanklin, in his brief on appeal, notes that Ashley’s description of Shanklin as 5’.11" to 6 feet tall is inaccurate because, he says, he "is only 5’6".” (Shanklin’s brief, p. 20 n. 14.) To support his claim, Shanklin cites a psychological assessment in which it is noted that Shanklin "reports he is 5'6" tall.” (C. 37.) Notably, however, Shanklin’s readout — an Alabama Department of Corrections inmate-detail sheet — used in the photo lineup indicates that Shánklin is, in fact, 5 feet 10 inches - tall.

. We recognize that Shanklin relies on this Court’s decisions in' Guthrie v. State, 616 So.2d 913 (Ala.Crim.App.1992), and Lewis v. State, 24 So.3d 480, 491-92 (Ala.Crim.App. 2006), as a basis for arguing that this case should be remanded to the circuit court. Those cases, however, are distinguishable from Shanklin’s, case. In Guthrie, this Court remanded Guthrie’s case to the circuit court finding that, under the plain-error doctrine, the State’s use of its peremptory strikes to remove nearly 80% (7 of 9) of the African-Americans from the jury venire was, under Ex parte Branch, "sufficient to raise an inference of discrimination.” 616 So.2d at 914. In Lewis, this Court remanded Lewis’s case to the circuit court finding that, under the plain-error doctrine, the State’s use of its peremptory strikes to remove 80% (4 of 5) of African-Americans from the jury venire established an inference of discrimination. 24 So.3d at 490-91.
Here, unlike in Guthrie and Lewis, the State’s use of its peremptory strikes is far from establishing that there is a "pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson[ v. Kentucky], 476 U.S. [79] 97, 106 S.Ct. [1712] 1723, 90 L.Ed.2d 69 [(1986)].” Ex parte Branch, 526 So.2d at 622. As explained by Shanklin, the State used its peremptory strikes to remove only 1 of the 5 African-American veniremembers from the jury, or, put another way, 20%.

. This claim is presented as Issue XVI in Shanldin's brief on appeal.

. This claim is' presented as Issue X in Shanklin’s brief on appeal.

. We note that, although Shanklin invoked Rule 615, Ala. R. Evid., for puiposes of the pretrial hearing on his motion to suppress evidence, the Alabama Rules of Evidence are inapplicable to such proceedings. See Rule 1101(b)(1), Ala. R. Evid. ("These rules, other than those with respect to privileges, do not apply in the following situations: (1) Preliminary questions of fact. The determination of *769 questions of fact preliminary to admissibility of evidence when the issue is to be determined by the court under Rule 104.”).

. This claim is addressed as Issue III in Shanldin's brief on appeal.

. Shanklin does not argue that the circuit court erred in admitting the photograph of Michael in his casket at his funeral. ‘Even if Shanklin had raised such a claim, we would conclude that the circuit court did not err in admitting that photograph. See, e.g., Hamilton v. State, 358 So,2d 766, 772 (Ala.Crim. App.1977) (holding that the admission of two photographs of the victim taken at the funeral home was not error).

. Shanklin, in his brief on appeal, claims that “even though the State agreed and the trial court limited introduction of photographs of the children to one picture, the State introduced four pictures with children in them.” (Shanklin’s brief, p. 27.) Although Shanklin claims that the circuit court limited the State to introducing only oné picture of the children, Shanklin’s assertion is incorrect. Shanklin’s motion to suppress did not address all photographs of Michael’s children. Instead, Shanklin’s motion addressed only four photographs . of Michael’s children in their bedroom. The circuit court’s ruling,, with which the State complied, limited the State to introducing only one photograph of the children sleeping in their bedroom. (C. 536.)

. Shanklin, in his brief on appeal, recognizes that "Alabama law is against [him] on this position” and asks this Court to "reexamine[] and overturn[]” previous rulings. (Shanklin's brief, p. 29, 30.) We, however, decline to do so.

. Although Shanklin failed to comply with Rule 28(a)(10), Ala. R.Crim. P., this Court reviews his claim for plain error. See, e.g., White v. State, 179 So.3d 170, 235 (Ala.Crim. App.2013) (opinion on return to remand); Brooks v. State, 973 So.2d 380, 392 n. 6 (Ala.Crim.App.2007); and Clark v. State, 896 So.2d 584, 633 n. 14 (Ala.Crim.App.2000).

. We recognize that, although Shanklin argued that admission of text messages would be hearsay, State’s Exhibit 18 does not include the substance of any text messages sent from the telephone number associated with those records. As stated'above, State’s Exhibit 18 includes information detailing the call date and time, the telephone number that is being called, the telephone number that is being called from, and the call duration. In other words, State’s Exhibit 18 includes information that a conversation occurred but does not reveal the substance of that conversation.

. This claim is presented as Issue XII in Shanklin's brief on appeal.

. This claim is addressed as Issue VILA, in Shanklin’s brief on appeal.

. The State, in its closing argument, mentioned Ashley’s and Lori's testimony about attending Michael’s funeral as evidence of Michael’s being deceased.

. This claim is addressed as Issue II in Shanklin’s brief on appeal

. This claim is addressed as Issue VIII in Shanklin's brief on appeal.

. Notably, nothing in Shanklin’s photograph makes it immediately apparent that it is a "mug shot.” In fact, only two photographs used in the lineup—neither of which are Shanklin’s—depict an individual wearing an orange prison jumpsuit. Shanklin's photograph is a front-facing picture of Shanklin, which depicts his head and the top of his shoulders and a white collar, on a blue background.

. This claim is presented as Issue IX in Shanklin’s brief on appeal,

. Although the State did not specifically charge Shanklin as an accomplice and throughout its closing arguments consistently referred to Shanklin as the individual who shot both Michael and Ashley, the State, at the end of its rebuttal argument in closing, argued:
"The other thing he’s going to say is if you believe that Kevin was the shooter and not Antwain aiding and abetting that if you enter into something with a co-defendant and both of y’all have the intent to do this, that you’re just as guilty even if you didn’t pull the trigger. You’re going to hear the word aiding and abetting. Listen to what that means. The law covers that just in case, the law covers that.”
(R. 1631-32.) Thus, although Shanklin argues, as noted in Part XIII of this opinion, that “the State did not operate under an accomplice liability theory,” that assertion is incorrect.

. This claim is addressed as Issue VII.B. in Shanklin’s brief on appeal.

. This claim is presented as Issue V in Shanklin’s brief on appeal.

. Although the State, during the penalty phase of Shanklin’s trial, presented the jury with only four aggravating circumstances, the circuit court in its order imposing the death penalty on Shanklin found that there existed five aggravating circumstances. The circuit court’s finding of an additional aggravating circumstance, however, is not error. See, e.g., Ex parte Martin, 931 So.2d 759, 770 (Ala. 2004) ("In Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the defendant was sentenced to death for a murder committed during a robbery. Because the existence of one of the aggravating circumstances (that the murder was committed during a robbery) was determined by the jury, we concluded that Ring[ v. Arizona, 536 U.S. 584 (2002),] and Appreridi[ v. New Jersey, 530 U.S. 466 (2000),] did not require us to reverse the sentence. ‘Only one aggravating circumstance must exist in order to impose a sentence of death. Ala. Code 1975, § 13A-5-45(f). Thus ... the jury, and not the trial judge, determined the existence of the "aggravating circumstance.... ” ’ Waldrop, 859 So.2d at 1188. In the instant case, as in Waldrop, the jury determined the existence of one of the aggravating circumstances (i.e., that the murder was committed for pecuniary gain). Although the trial court in overriding the jury’s recommendation of a sentence of life imprisonment also considered the aggravating circumstance that the murder was ‘especially heinous, atrocious, or cruel’ when compared to other capital murders, all that is required to impose a sentence of death is the existence of one aggravating circumstance, which in this case was determined by the jury. ‘Therefore, the findings in.the jury’s verdict alone exposed [Martin] to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require.’ Waldrop, 859 So.2d at 1188,”).

. We recognize that Ward testified that she was “not sure if [Shanklin] even knew Michael.” (R. 697.) Tracy's testimony, however, does not foreclose the possibility that Shanklin did, in fact, know Michael and know that Michael sold marijuana.

. Although Shanklin argues that "the record is entirely devoid of any such indication” that several jurors' emotions may have, hindered their ability-to follow the law and to impose the death penalty, nothing in the record demonstrates that the circuit court’s observations were inaccurate or incorrect.

. This claim is addressed as Issue XIV in Shanldin’s brief on appeal.

. This claim is addressed as Issue XV in Shanklin’s brief on appeal.

. This claim is addressed as Issue XVIII in Shanklin’s brief on appeal.